Filed 1/8/25 Madison v. Theodore CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| KYLE MADISON et al., | B310551, B313727, B314812 |
| Plaintiffs and Appellants, | (Los Angeles County Super. Ct. No. BC459696) |
| v. | |
| MICHAEL THEODORE, | |
| Defendant and Appellant. | |

APPEALS from a judgment and orders of the Superior Court of Los Angeles County, Gregory W. Alarcon, Judge. Judgment affirmed as modified; order on motion to tax costs affirmed in part, reversed in part, and remanded; order on attorneys' fees affirmed.

Klapach and Klapach and Joseph S. Klapach for Defendant and Appellant Michael Theodore.

Lyle R. Mink for Plaintiffs and Appellants.

————————————

Michael Theodore appeals from a judgment entered after a court trial (case no. B310551) awarding Kyle and Marjan Madison[1] approximately $3.9 million in damages on their claims for breach of fiduciary duty and fraud based on Theodore's mismanagement of Casa W., LLC (Company), which the parties formed to operate a luxury rental villa in Cabo San Lucas, Mexico. Theodore contends the trial court erred in excluding from evidence financial statements prepared by Gecko Property Management (Gecko), the Mexican company that managed the villa, on the ground the statements had not been translated into English. Theodore also contends the court erred in crediting the opinion of the Madisons' forensic accounting expert, Anna Leh, who did not speak Spanish and did not consider certain invoices and bank statements. Theodore alternatively contends that if the judgment is not reversed, the damages should be reduced to no more than $97,070 due to numerous flaws in Leh's analysis.

In their cross-appeal, the Madisons contend the trial court erred in entering a judgment for Theodore on their cause of action for conversion after the court found there was no identifiable fund in which the Madisons had a possessory interest that Theodore was obliged to return to them.

Theodore also appeals from the trial court's postjudgment orders awarding the Madisons approximately $160,000 in costs (case no. B313727) and $1.7 million in attorneys' fees (case no. B314812). Theodore argues the court erred in awarding costs for the preparation of hearing transcripts that were not ordered by the court; for bond premiums incurred by the Madisons in a

---

[1] We refer to Kyle and Marjan Madison by their first names to avoid confusion.

separate action for a preliminary injunction; and for the fees of a court-appointed forensic accounting expert who was disqualified after she engaged in improper ex parte communications with the Madisons' lawyer.  With respect to the order granting the Madisons their attorneys' fees, Theodore contends the court erred (1) in awarding the Madisons their fees in opposing Theodore's successful motion for a mistrial after the court disqualified the court-appointed expert; and (2) in failing to offset the attorneys' fees award to the Madisons by the amount of fees Theodore incurred as a result of the mistrial.

We affirm the judgment but modify the damages award to correct errors in the trial court's calculation of unidentified income in Theodore's accounts that should have been deposited into the Company's accounts and the calculation of prejudgment interest.  With respect to the postjudgment motions, we reverse the May 4, 2021 order to the extent the trial court denied Theodore's motion to tax $84,971 spent on hearing and trial transcripts that were not ordered by the court and $2,400 in bond premiums incurred by the Madisons in the separate action for a preliminary injunction; we otherwise affirm the order.  We remand for the trial court to issue a final order specifying the amount of costs awarded to the Madisons consistent with this opinion.  We affirm the court's order awarding the Madisons their attorneys' fees.

3

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *The Casa W Investment[2]*

Kyle and Theodore met in 1988 when Kyle was a college student, and in the early 1990s Theodore employed Kyle at his San Fernando insurance agency.  Kyle became an attorney and married Marjan, a therapist, in 2000.[3]  Kyle and Theodore remained friends over the years.

Theodore first traveled to Cabo San Lucas (Cabo) in 1987, and in around 1993 he purchased land in the exclusive hillside community of Pedregal, where he built a house overlooking the Pacific Ocean that he named "Casa Theodore."  The Madisons stayed at Casa Theodore on numerous occasions between 1995 and 2005.

In 2005 Theodore approached the Madisons with a proposal that they partner with him to purchase and renovate the house next door to Casa Theodore to operate a luxury rental villa.  The villa was later named "Casa W."  Kyle was excited to invest with Theodore because Theodore lived in Cabo six months of the year, held dual Mexican and American citizenship, and spoke fluent Spanish (the Madisons did not speak any Spanish).  Theodore had experience renting out Casa Theodore and had cultivated local contacts in construction and hospitality.  Marjan was less enthusiastic but ultimately agreed to participate.

---

[2]    The factual background is taken from the parties' testimony, the trial exhibits, and the undisputed facts in the trial court's November 10, 2020 amended statement of decision.

[3]    Kyle and Marjan separated in 2006, and their divorce was finalized in 2010.

4

In January 2005 Kyle filed articles of organization for the Company, and the same month the parties entered into a purchase agreement to buy Casa W through an offshore trust, Megapoint Ltd. The purchase agreement provided that the Madisons (together) and Theodore would each have a 50 percent ownership interest in the villa and would evenly split profits, which were defined to include "rental profits, sale of the property, and any other income . . . derived from the property." Each party was required to contribute $500,000 toward the purchase, plus $175,000 for renovations and $75,000 for acquisition and management fees, for a total investment of $750,000. The agreement stated the parties' "main purpose" was to use Casa W as a rental property, although each party could also stay in the villa for two weeks each year. The parties agreed to meet monthly to discuss design, construction, and furnishings, but Theodore maintained "complete discretion on a day-to-day basis regarding these matters."

The purchase agreement stipulated that Gecko, a local property management company that managed Casa Theodore, would manage the renovation and rental operations of Casa W. Gecko would "provide to each partner an itemized breakdown of labor and materials and costs." However, as manager of the Company, Theodore was required to "provide a separate report outlining all work and progress that will include photos whenever possible to [the] Madisons. Receipts of construction or other costs shall be provided to the Madisons upon request." The parties agreed to open a bank account in the Company's name at Bank of America in California for the purpose of paying expenses and depositing "any future profits such as rental income or sale of property."

The parties subsequently entered into an operating agreement, with a retroactive effective date of January 3, 2005. The operating agreement provided that Theodore was the sole manager of the Company with authority to make "all decisions concerning the management of the Company's business," to preside over the members' meetings, and to supervise "the business and affairs of the Company." Members' fiduciary duties were limited to the duty of care and a duty of loyalty. The duty of loyalty was defined to include obligations "[t]o account to the company and hold as trustee for the Company any property, profit or benefit . . . . [¶] . . . [t]o refrain from dealing with the Company . . . as or on behalf of a party having an interest adverse to the Company . . . and [¶] [to] refrain from competing with the company in the conduct of the Company business."

With respect to capital contributions, the operating agreement stated that no member was required to make additional capital contributions beyond the member's initial $750,000 investment, but if the Company's revenues were insufficient to pay its expenses, a member had the option to contribute additional capital and thereby have his or her percentage interest adjusted to account for the contribution. No member was entitled to withdraw funds from the Company except through the dissolution and winding up of the company.

Renovations to Casa W began around February 2005 and quickly ran over budget as the scope of construction expanded. By the end of 2005 the Madisons had contributed $170,000 beyond their initial investment, and renovations were far from complete. Although the Madisons had doubts about the validity of the costs reported by Theodore and the scope of the renovations, in early 2006 the parties signed an addendum to

their "partnership agreement"[4] in which the Madisons agreed to sell 2.5 percent of their "shares" to Theodore for $43,750 and contribute the proceeds of the sale toward construction, while Theodore would contribute another $43,750 of his own cash. The Madisons contend the addendum modified only the parties' profit participation shares and that Theodore had assured Kyle that the parties' 50/50 voting rights would be unchanged by entering the addendum; Theodore contends the addendum modified the parties' ownership interests, giving him majority control over the Company.

Between 2006 and 2009 the prospects of the Company and the parties' relationship further deteriorated. The parties made additional contributions for ongoing renovations, but the Madisons rejected Theodore's proposal to build a discotheque and additional rooms for party rentals. Theodore ultimately paid for some of the construction himself, taking the position the Madisons were accumulating debt to the Company, whereas the Madisons believed they had no obligation to pay for any construction that was not approved and for which they believed the costs were inflated and unsubstantiated. After Casa W became available for rent, it failed to generate sufficient income to cover expenses. Theodore attributed the lack of success to the 2008 global recession and a swine flu epidemic in 2009.

In October 2009 Theodore informed the Madisons that due to the "dire economic circumstances" and the Madisons' failure to

---

[4]     The trial court observed that it was ambiguous whether the reference to the "partnership agreement" in the addendum referred to the purchase agreement or the operating agreement, but the court found it must refer to the purchase agreement because the operating agreement had not yet been executed.

7

contribute funds to maintain Casa W, Theodore was imposing penalties and interest on the Madisons' share of the operating expenses, and they would forfeit their voting rights if they did not pay.  In February 2010 Theodore convened a special meeting of the Company (which the Madisons did not attend) in which he voted his majority membership interest to amend the operating agreement and adjust the capital accounts in his favor based on his contributions and the Madisons' unpaid obligations to the Company.  Sometime between February and April 2010 Theodore changed the locks on Casa W and stopped communicating with the Madisons.  Theodore later blocked Kyle's access to Casa W's bank account.

B.      *The Complaint and Cross-complaint*

On April 15, 2011 Kyle[5] filed this action against Theodore and the Company, asserting causes of action for breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, fraud, dissolution of the Company, appointment of a receiver, accounting, and a preliminary and permanent injunction.  The complaint alleged Theodore engaged in "persistent and pervasive fraud, mismanagement, and abuse of authority"; he misappropriated Company funds and commingled them with his personal accounts; he refused to providing an accounting of the Company's income and expenses; and he interfered with Kyle's interests in the Company and Casa W.  Kyle's prayer for damages included, in relevant part, compensatory and punitive damages, attorneys' fees and costs

---

[5]      Kyle purchased Marjan's interest in the Company in 2010 as part of their divorce.

under the operating agreement, and orders appointing a receiver, dissolving and winding up the Company, and selling Casa W.

On April 13, 2012 Theodore and Casa W filed a cross-complaint against the Madisons, asserting causes of action for declaratory relief, breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and fraud.

C.    *The 2015 Trial*

In January 2013 the trial court[6] appointed Pamela Wax-Semus, a certified fraud examiner and experienced forensic accounting expert, as the court's expert under Evidence Code section 730.  The court ordered Wax-Semus to analyze and determine 17 categories of inquiry, focusing on the income and expenses of the Company, Casa W, and Casa Theodore, and the balances due to the Madisons and Theodore from 2006 to the present.  In designating the scope of Wax-Semus's examination, the court found:  "It is necessary to itemize the various items that make the total in order to allow proper cross-examination of any totals that are reached. . . .  The court is familiar with the methodology that is used by Pamela Wax-Semus and the court believes that the strength of her opinions are usually based upon the detailed itemization that is painstakingly determined on an item-by-item analysis which are placed into tables to allow for confirmation of her conclusions.  Also the itemization will serve as a basis for any [Evidence Code section 730] expert that may be called by a party to oppose Wax-Semus' opinion."

---

[6]    Judge Frederick C. Shaller presided over the action from February 27, 2012 until March 18, 2013.

A 15-day bifurcated court trial of the parties' equitable causes of action began on April 28, 2015.[7] As described by the trial court, Wax-Semus submitted a "voluminous report and addenda" with schedules in which she performed a line-by-line analysis for the 17 categories of inquiry after organizing "tens of thousands of documents, including, handwritten notes in Spanish and English, receipts, checks, bank records, meeting minutes, rental calendars, etc." Wax-Semus testified for several days at the trial and was extensively cross-examined for bias. The parties' experts relied heavily on Wax-Semus's analysis, and the court found the analysis was "exceedingly credible, reliable, and instructive." Wax-Semus testified that Theodore had not produced all of the Company's financial records. Theodore testified to the contrary that he had produced all requested documents, but the court found his "demeanor was not consistent with forthright and credible testimony."

In a 43-page statement of decision filed in October 2015, the trial court found that Theodore breached his fiduciary duties to the Madisons, and the court ordered dissolution of the Company. The court also ordered an accounting and imposition of a constructive trust, noting "the difficulty [the Madisons] had obtaining documents from [Theodore] coupled with Wax-Semus' conclusions that defendant did not produce all of the documents requested." The court set a trial-setting conference for the remaining causes of action.

---

[7] Judge Samantha P. Jessner presided over the April 2015 trial and subsequent proceedings until March 27, 2017, when she recused herself.

10

D.  *Disqualification of Wax-Semus and Mistrial*

On March 4, 2016 the trial court entered an order dissolving the Company, effective October 22, 2015.  The court appointed Richard K. Diamond as the liquidator to wind up the company's affairs and sell Casa W.  Diamond was granted broad authority to dispose of the company's assets and, at his sole discretion, to rent out Casa W during the winding-up period.  The court ordered Theodore to provide Diamond with all books and records for the Company and access to its bank accounts, and to surrender physical access to Casa W.

Also on March 4, 2016, in preparation for the second phase of the trial, the trial court under Code of Civil Procedure section 639, subdivision (a)(2),[8] appointed Wax-Semus as a referee to conduct an accounting.  The court ordered Wax-Semus to "'prepare a detailed accounting of all receipts and disbursements, which includes an analysis of source documents,'" "'a detailed analysis of the financial accounting records of [the Company],'" and "'a detailed tracing analysis to [enable] the court to make determinations regarding the imposition of a constructive trust.'"

Theodore resisted Wax-Semus's efforts to collect the financial records of the Company, prompting the trial court to order Theodore's deposition and to make clear to Theodore that if

_____

[8]     Further undesignated statutory references are to the Code of Civil Procedure.  Section 639, subdivision (a)(2), provides that a trial court may appoint a referee "[w]hen the taking of an account is necessary for the information of the court before judgment, or for carrying a judgment or order into effect."

11

he did not produce the requested financial records, he may be held in contempt.  Because Wax-Semus lacked subpoena power, she relied on the Madisons' attorney, Lyle Mink, to issue subpoenas to obtain the requested documents from Theodore.  Wax-Semus corresponded frequently with Mink and Kyle in connection with the document collection efforts, and Theodore and his attorney, Daniel Spielfogel, were often omitted from these emails.

In many of the ex parte emails, Mink and Kyle made disparaging remarks about Theodore and Spielfogel.  For example, in a May 2016 email, Mink wrote, "Another BS letter from the thief's lawyer.  The thief worried about taxes?  Give me a break.  I'm guessing he's already cheated the IRS out of plenty."  Although Wax-Semus never engaged in personal attacks, at times she appeared to agree that Theodore was withholding documents, as shown by a May 12, 2016 email Wax-Semus wrote to Mink with respect to an incomplete production, stating, "This is only an example of what I have to deal with."  Wax-Semus's assistant wrote to Mink later that month, "Since in the past Mr. Theodore never produced the statements for the merchant account [Wax-Semus] feels that you should subpoena the account so we don't waste time waiting for Mr. Theodore not to produce them."  In other instances, Wax-Semus appeared to assist the Madisons in presenting their position at hearings.  For example, when forwarding materials to Mink, she wrote, "I hope the attached document package helps" and "[a]ttached are schedules/documents you may be able to use at the hearing on Thursday."

Citing these ex parte emails, as well as other emails produced before the 2015 trial, in early 2017 Theodore filed a

motion to disqualify Wax-Semus and to vacate the October 2015 statement of decision.[9] On March 24, 2017 the trial court (Judge Jessner) granted the motion in part, disqualifying Wax-Semus from serving as referee and from testifying as an expert at the second phase of the trial. The court found Wax-Semus "consistently violated her duty to refrain from engaging in *ex parte* communications" and was "exposed to a barrage of disparaging comments" about Theodore, leading to the "[i]nescapable" conclusion that "Wax Semus has become Plaintiffs' expert in this matter, rather than a neutral referee who abides by the standards imposed on judicial officers." The court vacated the trial date and ordered the parties to confer on the appointment of a new referee.

The trial court declined, however, to vacate the 2015 statement of decision. The court explained that at the time of the 2015 trial, Theodore had possession of all of Wax-Semus's communications up to that time, and his attorney examined Wax-Semus at length during the trial about her emails with Mink and her potential bias. Although Mink disparaged Theodore and Spielfogel in some of those emails, the court found "there [was] no evidence that Wax Semus entertained the same bias." The court reiterated its finding that Wax-Semus "always exhibited competency in her trade of forensic accounting" and noted that "[t]he fact she could produce the high quality reports and schedules that she did was even more impressive given that it is

---

[9] Theodore also argued Kyle and Mink had improper ex parte communications with the receiver, Diamond, and his associates. These allegations generated ancillary litigation and appeals but are not at issue here. (See *Theodore v. Kollitz* (June 24, 2021, B291700 [nonpub. opn.].)

13

fair to say that [Theodore] and his lawyer have stonewalled discovery at every turn and continue to do so this day." The court ordered Wax-Semus to deliver the source data for her forensic analysis to the parties.

On March 27, 2017 Judge Jessner recused herself from the case under section 170.1, subdivisions (a)(6)(A)(ii) and (iii) and (a)(6)(B).[10] In response to the Madisons' request for information concerning the basis for the recusal, on April 6 Judge Jessner filed an order stating that, after reviewing the evidence in connection with the motion to disqualify Wax-Semus, "the court formed opinions as is permitted, appropriate, and necessary to rule on those motions," but "further proceeding in this case should proceed before another judicial officer unencumbered by such opinions."

In April 2017 Theodore filed a motion for a mistrial and to strike the October 2015 statement of decision based on Judge Jessner's recusal, which the Madisons opposed. After the trial court[11] denied the motion, Theodore filed a petition for writ of mandate challenging the court's order. In *Theodore v. Superior*

---

[10] Section 170.1, subdivisions (a)(6)(A)(ii) and (iii), provide, respectively, for mandatory disqualification of a judge where "[t]he judge believes there is a substantial doubt as to his or her capacity to be impartial" or "[a] person aware of the facts might reasonably entertain a doubt that the judge would be able to be impartial." Section 170.1, subdivisions (a)(6)(B), provides that a judge may be disqualified based on "[b]ias or prejudice toward a lawyer in the proceeding."

[11] On April 11, 2017 the case was assigned to Judge Gregory W. Alarcon, who presided over the matter through the second trial and entered the judgment and orders at issue in the instant appeals.

*Court* (Jun. 7, 2017, B282670) (nonpub. order), we held the trial court erred in denying Theodore's mistrial motion because "'a party is entitled to have the same judge try all portions of a bifurcated trial that depend on weighing evidence and issues of credibility, and . . . if that judge is unavailable to do so, a mistrial must be declared.'" (*Ibid.*, quoting *European Beverage, Inc. v. Superior Court* (1996) 43 Cal.App.4th 1211, 1213.) We invited the trial court to vacate its order and declare a mistrial in lieu of issuance of a peremptory writ.

On June 27, 2017 the trial court declared a mistrial. On August 22 the court discharged Diamond as receiver and cancelled a pending sale of Casa W. The court ordered Diamond to deliver all monies of the Company and possession of Casa W to the parties jointly in the care of their attorneys pending the retrial.

E.     *The 2018 Trial*

The trial court held a 77-day court trial on all claims, commencing on June 25, 2018. As described by the court, the trial became "a post mortem of the previous trial along with lengthy examination of the ex parte issues heard by Judge Jessner in the general guise of impeachment." Impeachment "took an uncivil turn," and the trial was "filled with endless *argumentum ad hominem* attacks on the witnesses and on opposing counsel." Kyle testified for nearly 12 days, Marjan for five days, and Theodore for nearly 20 days. Other witnesses included a minority stakeholder in Gecko, a travel agent who placed bookings at Casa W and Casa Theodore, Diamond and his colleague, Theodore's accountant, Spielfogel, a Bank of America

15

branch manager, the Company's corporate counsel and secretary, and Kyle's second wife.

Wax-Semus testified for nearly three days as a percipient witness regarding her collection of financial records and compilation of the income and expenses of the Company prior to her disqualification. Wax-Semus was excluded from testifying as an expert, and although the data she compiled were heavily used by both parties' experts, her own forensic conclusions were excluded.[12] She was cross-examined at length about the circumstances leading to her disqualification and any potential bias in the data.

1. *Expert testimony of Anna Leh*

The testimony of the parties' trial experts is central to these appeals. The Madisons' expert, Leh, is a forensic accountant and certified fraud examiner. Leh was tasked with analyzing the financial records of the Company, Casa W, Casa Theodore, and Theodore's personal accounts, including bank records, receipts, and other records of the rentals and expenditures of the villas, to determine the monies the Madisons should have received in profits. Leh principally relied on the financial records collected by Wax-Semus and data from the

---

[12] Following Wax-Semus's disqualification, the trial court ordered the parties to provide the court with the name of a copy service to which Wax-Semus would transfer her source documents. Theodore refused to agree on a service, leading the Madisons to serve Wax-Semus with a deposition subpoena to obtain her source data before the 2018 trial. The deposition took place in January 2018.

Company's QuickBooks[13] electronic accounting records, which Theodore produced only after the 2015 trial. Leh determined the records produced by Theodore over the course of the litigation were incomplete because Theodore did not produce all of his bank statements, and many documents he produced could not be reconciled with electronic ledgers in QuickBooks.

Leh's general approach to identifying the monies owed to the Madisons was to calculate a restated balance in the Company's accounts by taking the balances reported by Theodore, adding Company income that should have been deposited into the Company's accounts (principally, rental income), and deducting unverified expenses. Expenses that were removed included those that were inflated or that lacked proof of payment such as a cancelled check. Leh also calculated the income of Casa Theodore for periods when Casa W should have been rented, based on the Madisons' argument Theodore misdirected the Company's rental opportunities to Casa Theodore. Leh also added in imputed net income for the period from 2014 through 2018 when Casa W was not rented out because it was tied up in the litigation and by Theodore's alleged removal of furniture. Finally, Leh calculated the amounts the Madisons contributed to the Company toward Casa W's renovation beyond their initial investment of $750,000, based on the Madisons' position that all further expenses were fraudulent, inflated, or unauthorized.

Leh largely disregarded a group of documents the parties and trial court referred to as the "Gecko statements." The Gecko

---

[13] QuickBooks is "a software package that features consolidated accounting . . . for small businesses." (*Bustamante v. Intuit, Inc.* (2006) 141 Cal.App.4th 199, 201-202.)

17

statements comprise a series of electronic ledger reports prepared by Gecko (which was managing the property)[14] that itemize the income and expenses of the Company from 2007 through 2009 and identify the date, recipient, and category of expenditure (e.g., construction, maid service, utilities, taxes), followed by a large and heterogenous collection of photocopies of invoices, bills, order forms, and handwritten notes that ostensibly support the expenditures itemized in the ledgers. The ledgers are in English; the supporting documents, totaling nearly 1500 pages, are mostly in Spanish.

Leh testified she reviewed the Gecko statements in their entirety, but she disregarded them when calculating the Company's restated balances because the Gecko ledger entries were not verified "with supporting documentation that all of the expenses included on the Gecko invoices were actually applicable to Casa W or verified they were [actually] paid and from what source." Moreover, the expenses reported in the Gecko statements were much larger than the expenses Theodore projected for the Madisons at the time they were incurred. During cross-examination, Leh admitted she did not speak fluent Spanish and did not consult a Spanish speaker for help in reviewing the documents before concluding they did not support the Gecko ledger entries. However, Leh testified a "good amount"

---

[14] It appears from the trial transcript that Gecko made the entries in the ledgers "most" of the time between 2007 and 2009, but Theodore also had access to the ledgers and made adjustments. Julianne Warriner, a Gecko stakeholder and caterer, testified about Gecko's general bookkeeping practices for its clients, but she did not have personal knowledge about the Gecko statements.

of the documents were in English and she used an internet search engine to translate "some" of them.

    2.    *Expert testimony of Darryl Zengler*

Theodore's expert, Darryl Zengler, is a forensic economist with experience building damages models used to calculate lost wages from a personal injury and lost profits due to a breach of contract. Zengler is not a forensic accountant or certified fraud examiner, and he had no prior experience in a fraud investigation or opining on the accuracy of the books and records of a business. Zengler's principal testimony was that based on the operating agreement, the Madisons no longer held any interest in the Company. Because Theodore contributed all of the money to cover Casa W's expenses after the first few years, he incrementally increased his ownership interest to the point that the Madisons had no interest remaining.

Zengler challenged Leh's opinion based on her refusal to consider the Gecko statements. Zengler opined that Leh ignored significant and clearly legitimate expenses that would have been incurred in the management and operation of Casa W, such as Mexican taxes. Whereas Leh discounted the Gecko statements altogether, Zengler credited the Gecko statements in their entirety. During cross-examination, Zengler admitted he had been asked to assume the invoices and receipts among the Gecko statements supported the ledgers, so he "just accept[ed] the Gec[k]o expenses" and "didn't tabulate the receipts and cross check them with the [Gecko] statements" or otherwise check the veracity of reported expenses. Zengler also admitted he did not

19

review any bank statements or look to see if there were cancelled checks corresponding with any Casa W invoices.[15]

F.     *Statement of Decision*

Over an 18-month period after the conclusion of witness testimony, the parties presented closing arguments, reached stipulations regarding the admissibility of exhibits, submitted additional briefing, and presented further oral argument on damages issues.[16] The trial court took the case under submission in February 2020, and on May 6 the court issued a proposed statement of decision. After ruling on the parties' objections, on July 6 the court issued a statement of decision. On November 10, after further proceedings, the court filed a 65-page amended statement of decision (statement of decision).

As set forth in the statement of decision, the trial court had an extensive opportunity to evaluate the demeanor and credibility of the witnesses over the course of the long trial, and the attorneys cross-examined the witnesses aggressively regarding credibility and bias. The court found Kyle was "a credible witness," and the court "did not find Theodore credible." With respect to Theodore's testimony that any diversion of Company income was accidental, the court found, "His demeanor, the number of times these alleged mistakes occurred, and his

---

[15]    Zengler testified about Theodore's damages based on the cross-claims, which exceeded $1.5 million. The cross-claims are not at issue on appeal.

[16]    The appellate record does not include the parties' admissibility stipulations or the supplemental briefing on damages, and the reporter's transcript does not include a record of the parties' posttrial court hearings regarding damages.

20

failing to call the staff members working with him who supposedly made these mistakes as witnesses to explain why or how this occurred, led the court to find his testimony unconvincing and unpersuasive." The court also found that Wax-Semus's work prior to her disqualification was reliable, explaining, "This court having an opportunity to judge the credibility of Pamela Wax-Semus independently found her credible and believable and found her testimony credible that the ex parte communications that were negative against [Theodore] were an occupational hazard . . . [and] she had developed a professional defense shield that allowed her to ignore the disparaging rants from [Kyle] and his counsel as she endeavored to complete her task."

The trial court found Leh's analysis, which was "based on the conscientious digging and follow up of Pamela Wax-Semus'[s] initial search of relevant records . . . to be credible and persuasive given the limited records she received from Theodore that could be reconciled." Leh's method and approach were "more credible and reliable than Zengler's critiques" because Leh "based her conclusions on expenditures that were verifiable and received into this courtroom as evidence after proper authentication." Zengler had no experience in fraud investigations; did not look at the Company bank accounts; never verified if there were back-up receipts for the Gecko statements; and "did not investigate or request back-up documentation to verify that Theodore actually made payments towards the LLC as Capital Contributions," instead focusing on criticizing Leh's conclusions. Moreover, in contrast to Leh, Zengler did not attempt to verify the information he received from Theodore. The court found that Zengler's conclusions based on an assumption the Madisons' percentage

21

interests had been reduced to zero were "unsupported, unreliable and unpersuasive."

The trial court recognized that Leh did not consider the Gecko statements in her analysis, but it found the veracity of the invoices Theodore submitted to the Company as the expenses of Casa W was a highly contested issue, and "many [of the Gecko statements] were not admitted into evidence because they constituted inadmissible hearsay; lacked foundation; were not authenticated; or were either partially or completely in Spanish." In a footnote in connection with its ruling, the court cited California Rules of Court, rule 3.1110(g) (Rule 3.110(g)), which specifies that foreign-language exhibits must be accompanied by a certified translation. The court also noted that "Theodore, as a fiduciary, had the obligation to provide the appropriate documentation in a usable form to the Madisons."

With respect to the Madisons' causes of action, the trial court found Theodore was liable for breach of contract, breach of fiduciary duty, breach of the covenant of good faith and fair dealing, and fraud, and the court ordered an accounting for the period from May 2014 to the present. Among other findings, the court found Theodore falsely represented to the Madisons that Casa W generated little to no income and the Madisons needed to pay more expenses; he deposited Company funds into his personal accounts; he diverted Casa W rental income and opportunities to Casa Theodore; he opened bank accounts other than those agreed upon by the Madisons; he commingled Company funds with his personal funds; and he improperly reduced the Madisons' ownership interest in the Company to zero and locked them out of Casa W. The court found against the

22

Madisons on their cause of action for conversion,[17] reasoning that "[m]oney can only be the subject of conversion if it is a specifically identifiable fund or corpus for which the defendant had an obligation to keep intact or deliver" and "[n]o such identifiable fund or corpus exists here."[18]  The court found against Theodore on all causes of action in his cross-complaint.

The trial court determined the parties' ownership interests in the Company were 52.5 percent for Theodore and 47.5 percent for the Madisons based on its finding that the 2006 addendum to the Company operating agreement was "freely entered into by the Madisons and should bind them."  Although Leh opined that Theodore created a false need for funds in order to demand additional contributions from the Madisons, thereby forcing them to enter the 2006 addendum, "the Madisons could have insisted they look at all available records at the time before they signed

---

[17]    In November 2018, after the conclusion of witness testimony, the Madisons made a motion to amend their complaint according to proof to include a cause of action for conversion. Their motion and Theodore's response are not in the appellate record, but it appears the trial court took the matter under submission and addressed it only in the statement of decision. We interpret the court's brief discussion of the conversion cause of action in the statement of decision as a ruling allowing the amendment but entering judgment for Theodore.

[18]    The trial court found the Madisons' causes of action for dissolution of the LLC and appointment of the receiver were moot because the LLC had been dissolved and Diamond was discharged.  The court denied the Madisons' cause of action for injunctive relief, finding their request—for an order preventing Theodore from interfering with any adverse court orders—was impermissibly vague.

the agreement giving up 2.5 percent interest." The court calculated the Madisons' total damages as $4,222,750, comprising the Madisons' capital contributions in excess of the $750,000 ($407,947); undistributed income to the Company based on Leh's calculation of the company's adjusted cash balances after considering authenticated documentation of revenue and expenses ($1,153,206); unidentified income in accounts controlled by Theodore that the court found belonged to the Company ($377,704); Casa Theodore's income owed to the Company based on Theodore's violation of his obligation not to compete with the Company ($302,770); imputed net income for the period from April 2016 to May 2018 when Theodore's conduct prevented the rental of Casa W ($494,497); and prejudgment interest ($1,486,631). The court did not award punitive damages. The court found Theodore was entitled to a $266,000 credit for a share of expenses he paid to transfer Casa W to the Madisons as part of satisfaction of the judgment (including Theodore's share of taxes, repairs, agent fees, and miscellaneous expenses).

G.    *Judgment and Postjudgment Orders*

On January 22, 2021 the trial court entered judgment. The trial court awarded damages to the Madisons in the amount of $3,928,300 ($4,222,750 less a credit of $294,450 for the costs of transferring Casa W).[19] The judgment directed Theodore to transfer all interest in Casa W and the Company's bank accounts to the Madisons, who would sell Casa W, with proceeds of the sale credited against the judgment, with any excess proceeds

---

[19]    The record does not reflect the reason for the increase in the credit given to Theodore in the judgment from the $266,000 credit awarded him in the statement of decision.

24

divided between the Madisons and Theodore according to their ownership interests (47.5 percent and 52.5 percent, respectively).

On January 26, 2021 the Madisons filed a memorandum of costs, and on February 5 they filed a motion for attorneys' fees. On February 10 Theodore filed a motion to tax costs, and on February 18 he filed a motion for a new trial.

Theodore timely appealed from the judgment, and the Madisons cross-appealed (B310551). Theodore separately and timely appealed from the trial court's May 4, 2021 order granting in part and denying in part his motion to tax costs (B313727) and from the court's June 28, 2021 order awarding the Madisons $1,751,500 in prevailing party attorneys' fees (B314812).

## DISCUSSION

A. *Theodore's Appeal from the Judgment (Case No. B310551)*

1. *The trial court did not abuse its discretion in excluding the Gecko statements*

Theodore contends the trial court erred in excluding the Gecko statements based on its incorrect interpretation of Rule 3.1110(g) as requiring that trial exhibits be translated into English to be admissible. But even if Rule 3.1110(g) only applies to civil motions (as Theodore argues), Theodore has not met his burden to show the court erred or abused its discretion in any ruling on the admissibility of the Gecko statements.[20]

---

[20] Theodore also contends the trial court improperly excluded the Spanish-language Gecko documents based on its finding in a footnote that "Theodore, as a fiduciary, had the obligation [to] provide the appropriate documentation in a usable form to the

25

We generally review a trial court's evidentiary rulings for an abuse of discretion. (*In re Marriage of Brubaker & Strum* (2021) 73 Cal.App.5th 525, 540, fn. 5; accord, *Pilliod v. Monsanto Co.* (2021) 67 Cal.App.5th 591, 630; see *People v. Waidla* (2000) 22 Cal.4th 690, 717 ["[b]roadly speaking, an appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence"].) A ruling constitutes an abuse of discretion if it is "'so irrational or arbitrary that no reasonable person could agree with it.'" (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773; accord, *Shenefield v. Shenefield* (2022) 75 Cal.App.5th 619, 638.) However, an "'"[a]ction that transgresses the confines of the applicable principles of law is outside the scope of discretion and we call such action an 'abuse' of discretion."'" (*Shenefield*, at p. 638; see *Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712 [under an abuse of discretion standard, "[t]he trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious" (footnotes omitted)]; *Malloy v. Superior Court* (2022) 83 Cal.App.5th 543, 551 [same].)

---

Madisons." Theodore argues the Corporations Code did not impose a duty for him to translate the Gecko documents, and even if it did, the purchase agreement limited that duty. Because we conclude Theodore has not shown an abuse of discretion in the exclusion of any Gecko statements, we do not reach the question whether Theodore was required under the Corporations Code to provide the Madisons with translations of the LLC's books and records. Moreover, the court did not cite Theodore's failure to translate the Gecko statements in its finding that Theodore breached his fiduciary duty to the Madisons.

As set forth in the statement of decision, the trial court found that "many" of the documents presented among the Gecko statements "were not admitted into evidence because they constituted inadmissible hearsay; lacked foundation; were not authenticated; or were either partially or completely in Spanish." In a footnote, the court quoted Rule 3.1110(g), which states that "[e]xhibits written in a foreign language *must be accompanied by an English translation, certified under oath by a qualified interpreter*." Theodore argues the court erred because Rule 3.1110 applies only to exhibits submitted with civil motions, not trial evidence.

We assume without deciding that Theodore is correct that Rule 3.1110(g) is limited to civil motions based on its placement in the Rules of Court: Rule 3.1110(g) falls within chapter 2 ("Format of Motion Papers") of division 11 ("Law and Motion") of the civil rules. (See *Woodland Park Management, LLC v. City of East Palo Alto Rent Stabilization Bd.* (2010) 181 Cal.App.4th 915, 923, fn. 5 [although statute chapter headings cannot "'creat[e] ambiguity when none exists,' . . . when there is ambiguity, organization and section headings may properly be considered in determining intent and '"are entitled to considerable weight"'"].)

However, even if the trial court erred in relying on Rule 3.1110(g), the Code of Civil Procedure and the Evidence Code required that all documents admitted at trial be translated into English. Code of Civil Procedure section 185, subdivision (a), states that "[e]very written proceeding in a court of justice in this state shall be in the English language, and judicial proceedings shall be conducted, preserved, and published in no other." Evidence Code section 753, subdivision (a), provides in turn, "When the written characters in a writing offered in evidence are

incapable of being deciphered or understood directly, a translator who can decipher the characters or understand the language shall be sworn to decipher or translate the writing."  It is undisputed that many witnesses did not understand Spanish with any degree of fluency.  Further, the court correctly expressed its concern that appellate review would be hamstrung without an English-language record.  Therefore, there was no error.

Moreover, Theodore fails to address the trial court's finding that many of the documents in the Gecko statements were excluded because they contained hearsay, lacked foundation, or were not authenticated.  In his opening brief, Theodore repeatedly cites to a 700-page compilation of documents that he refers to as the "Gecko statements."  But the court did not consider the documents as a single exhibit, instead ruling on the admission of selected pages of the Gecko statements.  Theodore has not met his burden to show the court's rulings on admissibility were an abuse of discretion because he has not identified any document he claims was erroneously excluded (other than his contentions concerning lack of a translation).[21]  "[I]t is a fundamental principle of appellate procedure that a trial court judgment is ordinarily presumed to be correct and the

_____

[21]     The record on appeal does not include a complete record of the filings, hearings, and stipulations regarding the admissibility of trial exhibits.  Insofar as Theodore contends the trial court made erroneous admissibility rulings prior to or after trial, he had the burden to produce a record showing the error.  (See *Mack v. All Counties Trustee Services, Inc.* (2018) 26 Cal.App.5th 935, 940 ["'"Failure to provide an adequate record on an issue requires that the issue be resolved against appellant."'"]; *Hotels Nevada, LLC v. L.A. Pacific Center, Inc.* (2012) 203 Cal.App.4th 336, 348.)

28

burden is on an appellant to demonstrate, on the basis of the record presented to the appellate court, that the trial court committed an error that justifies reversal of the judgment." (*Jameson v. Desta* (2018) 5 Cal.5th 594, 608-609; accord, *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564.) To overcome the presumption that a judgment is correct, an appellant "must affirmatively establish prejudicial error by providing an adequate record, citing to the record, and presenting a persuasive argument with citations to supportive legal authorities." (*LNSU #1, LLC v. Alta Del Mar Coastal Collection Community Assn.* (2023) 94 Cal.App.5th 1050, 1070 (*LNSU #1*); accord, *Lee v. Kim* (2019) 41 Cal.App.5th 705, 721 [appellant's "burden on appeal 'includes the obligation to present *argument and legal authority* on *each point* raised'"].)[22]

---

[22] It also appears that Theodore's attorneys cited court rules to challenge documents offered by the Madisons for lack of a translation. For example, on August 9, 2018, early in the trial, one attorney objected to the introduction of a Spanish-language document: "I would object to this. It has to be a certified translation. I looked at the court rules last night." On October 24 the attorney objected to the admission of documents because "each page has Spanish on it. Doesn't comply with the rules of court." Theodore's attorneys also introduced certified English translations for certain critical Gecko statements, which the trial court admitted, while consistently objecting to the Madisons' use of Spanish-language documents without a certified translation.

Under these circumstances, Theodore cannot complain on appeal of the trial court's exclusion of Spanish-language documents. (See *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1555 ["Where a

2.  *Substantial evidence supports the judgment in the Madisons' favor, but the damages award must be modified*

Theodore contends the judgment must be reversed because the trial court credited Leh's "unsupported and speculative" damages analysis that ignored the Gecko statements and Mexican bank account records.  Theodore alternatively contends that if the judgment is affirmed, the damages must be reduced more than forty-fold because of numerous defects in Leh's analysis.[23]  Leh's analysis provided substantial evidence to support the judgment against Theodore.  Although we reject most of Theodore's arguments as to the amount of damages, we agree that the court miscalculated the Madisons' share of Theodore's untraceable income.

a.  *Standard of review*

"'In reviewing a judgment based upon a statement of decision following a bench trial, we review questions of law de novo, and we review the trial court's findings of fact for substantial evidence.'"  (*State of California ex rel. Rapier v. Encino Hospital Medical Center* (2022) 87 Cal.App.5th 811, 828; accord, *Ribakoff v. City of Long Beach* (2018) 27 Cal.App.5th 150,

---

party by his conduct induces the commission of error, he is estopped from asserting it as a ground for reversal.  This application of the estoppel principle is generally known as the doctrine of invited error."].)

[23]  Theodore does not on appeal challenge Leh's qualifications to testify as an expert, and he does not contend the trial court erred in admitting her testimony at trial.

162.)  With respect to damages, "'[w]hether a plaintiff 'is entitled to a particular measure of damages is a question of law subject to de novo review.  [Citations.]  The amount of damages, on the other hand, is a fact question . . . [and] an award of damages will not be disturbed if it is supported by substantial evidence.'"'" (*Madani v. Rabinowitz* (2020) 45 Cal.App.5th 602, 610; accord, *Markow v. Rosner* (2016) 3 Cal.App.5th 1027, 1050; see *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1321-1322 ["In the absence of error in the admission of testimony supporting a claim of economic damages, . . . we will affirm the judgment if substantial evidence supports the damage award."].)

In reviewing a judgment for substantial evidence, "'"'any conflict in the evidence or reasonable inferences to be drawn from the facts will be resolved in support of the determination of the trial court decision.  [Citations.]" . . .  [T]he appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings].  [Citations.]"  [Citation.]  We may not reweigh the evidence and are bound by the trial court's credibility determinations.  [Citations.]  Moreover, findings of fact are liberally construed to support the judgment.'"'" (*Barickman v. Mercury Casualty Co.* (2016) 2 Cal.App.5th 508, 516 (*Barickman*); accord, *Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1102.)  "Substantial evidence is evidence that is 'of ponderable legal significance,' 'reasonable in nature, credible, and of solid value,' and '"substantial" proof of the essentials which the law requires in a particular case.'" (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1006; accord,

*Sacramento Municipal Utility Dist. v. Kwan* (2024)
101 Cal.App.5th 808, 813.)

"An expert's opinion is substantial evidence if it has evidentiary support and is accompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion. [Citation.] While inferences may support a judgment, 'the inference must be a reasonable conclusion from the evidence and cannot be based upon suspicion, imagination, speculation, surmise, conjecture or guesswork.'" (*San Diego Gas & Electric Co. v. Schmidt* (2014) 228 Cal.App.4th 1280, 1292.) Consequently, "when an expert bases his or her conclusion on factors that are 'speculative, remote or conjectural,' or on 'assumptions . . . not supported by the record,' the expert's opinion 'cannot rise to the dignity of substantial evidence' and a judgment based solely on that opinion 'must be reversed for lack of substantial evidence.'" (*Wise v. DLA Piper LLP* (US) (2013) 220 Cal.App.4th 1180, 1191-1192 (*Wise*); accord, *Lee v. Amazon.com, Inc.* (2022) 76 Cal.App.5th 200, 222 ["When the trial court accepts an expert's ultimate conclusion without critically considering his or her reasoning, and it appears the conclusion was based on improper or unwarranted matters, we must reverse the judgment for lack of substantial evidence."].) Conversely, "the trial court is free to reject testimony of a party's expert, so long as the trier does not do so arbitrarily." (*Lee*, at pp. 222-223; accord, *People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1567-1568.)

b.      *Leh had a reasoned basis for disregarding the Gecko statements and HSBC bank statements*

As discussed, Leh disregarded the ledgers and invoices compiled by Gecko between 2007 and 2009 when she calculated the Company's "restated" balances to correct for Theodore's improper withdrawals from and fraudulent expenses charged to the Company's accounts.  Leh opined that the Gecko statements were not "verified" with supporting documentation such as cancelled checks showing that expenses recorded on the ledgers were "actually applicable to Casa W" or evidence the invoiced amounts "were actual[ly] paid and from what source."  The trial court found Leh's conclusions were "based on credible evidence, because she based her conclusions on expenditures that were verifiable and received into this courtroom as evidence after proper authentication."

Leh also disregarded monthly bank statements issued by HSBC bank in Mexico.  Around 2007 Theodore opened Mexican accounts for Megapoint (Casa W's holding company), to facilitate local payments and currency exchanges.  Unlike the Company's Bank of America account in California, the Madisons were not signatories and had no control over the HSBC accounts.  Further, the trial court found Theodore stonewalled for years during the litigation (until 2016) before finally producing any HSBC statements.  Leh testified that although she reviewed the HSBC statements after they were produced, she "disallowed" transfers out of the HSBC accounts shown on the statements as evidence of payment of legitimate Company expenses, because the statements did not include sufficiently detailed information or cancelled checks to show that the transfers covered genuine Casa W expenses and liabilities.  The court did not admit the HSBC

33

statements into evidence, finding in its statement of decision only that "Theodore refused to provide those [HSBC] banking records, claiming he could not obtain them, even though he was a signatory on those accounts, and thus documents were under his control."[24]

Theodore argues Leh's methodology was fatally flawed because she ignored the Gecko and HSBC statements, which were the best evidence of the Company's expenses, and she instead placed an "artificial and unrealistic cap" of $6,000 on monthly expenses when restating the balances. But Leh's estimate of the Company's legitimate monthly expenses was not "'speculative, remote or conjectural'" (*Wise, supra*, 220 Cal.App.4th at pp. 1191-1192), and her assumptions were supported by other evidence that the trial court found more credible than the Gecko and HSBC statements. In particular, Leh used $6,000 per month as the measure of the Company's operating expenses because, as set forth in the minutes of the May 13, 2009 meeting of the members, Theodore reported to the Madisons that it cost $5,000 to $7,000 per month "to run the house"—a range that was supported by itemized monthly estimates for utilities, personnel expenses, taxes (including the Mexican hospitality tax, income tax, and value added tax), management and professional fees, and other miscellaneous expenses.

---

[24] On appeal, Theodore does not challenge the exclusion of the HSBC statements from evidence. An expert may of course rely on inadmissible evidence in forming her opinion, provided the evidence "is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which [her] testimony relates." (Evid. Code, § 801, subd. (b).)

34

Moreover, the trial court made findings that showed the Gecko and HSBC statements were not reliable evidence of the Company's monthly expenses, finding Theodore fraudulently inflated the Company's expenses, including by charging Casa Theodore expenses to the Company; he maintained exclusive control over the Company's income and expenses and its bank accounts and records; he produced only an incomplete portion of the records; and he was not a credible witness, especially with respect to his testimony regarding the use of Company money. Further, apart from his own testimony, Theodore did not present any witnesses who testified to the foundation, accuracy, or completeness of the Gecko or HSBC statements and the legitimacy of the expenses charged to the Company.[25]  In light of

---

[25]     As noted, Warriner testified the Gecko statements appeared to comport with Gecko's general recordkeeping practices for its clients, but she admitted she did not have personal knowledge regarding the Gecko statements for the Company, and she did not purport to authenticate them. Theodore's accountant (and personal friend), Homayoon Moshiri, testified that he relied on the income and expense information provided to him by Theodore without verifying it when he prepared tax filings for the Company.  The only other testimony as to the accuracy of the Gecko and HSBC statements was by Theodore.

Theodore explained that Dave Farrell, Gecko's owner and principal (and Theodore's friend), would deliver packets of accumulated expense documentation to Theodore during Theodore's visits to Cabo, or Farrell would send the materials in the mail.  According to Theodore, Gecko settled Casa W's expenses from Megapoint's pesos-denominated HSBC account but was reimbursed in lump sums out of Megapoint's dollar-

the overwhelming evidence presented at trial showing that Theodore engaged in pervasive fraud that overstated the expenses of the Company, Leh's approach of discounting these statements because the individual expense items could not be verified with any evidence in the record was reasonable.

Moreover, as the trial court found, Zengler did not present a credible, non-speculative, alternative basis for calculating the Company's expenses. As discussed, Zengler simply assumed the Gecko ledgers were, in their entirety, supported by the invoices. Zengler did not examine the veracity of any expense, nor did he "tabulate the receipts and cross check them with the statements." Zengler also admitted he did not review any bank statements or look for cancelled checks validating expense payments. Zengler opined the existence of an entry in the Company's QuickBooks was sufficient evidence of its accuracy—and Leh therefore should not have "restated" any of the Company's income and expense balances—yet Zengler admitted that anyone with access to the QuickBooks could make an entry. Zengler's opinion therefore rested on an assumption there had been no fraud, contrary to the finding of the court based on the evidence. Accordingly, the court did not abuse its discretion in finding "Leh's approach to be more credible than Zengler's." (See *Orange County Water Dist. v. Alcoa Global Fasteners, Inc.* (2017) 12 Cal.App.5th 252, 322-323 ["The fact that two experts disagreed on the factors used in their

---

denominated account, which resulted in ledger entries without clearly corresponding backup documentation. Gecko also managed the transfers between the Company's various accounts on Theodore's behalf, and Farrell (not Theodore) procured the HSBC statements that Theodore produced in 2016. Farrell did not testify at trial.

analysis under the circumstances here, however, does not mean one expert's conclusion was based on 'improper or unwarranted matters,' such that his conclusion was not substantial evidence. At most, the District has shown only run-of-the-mill disagreement between experts, which the trial court was entitled to resolve against the District."]; see also *People ex rel. Brown v. Tri–Union Seafoods, LLC, supra,* 171 Cal.App.4th at p. 1573 [although plaintiff's expert was eminently qualified and credibly testified mercury in fish was anthropogenic, the appellate court had "no power to substitute [its] own deductions or preferred set of facts" where trial court found the defendant's expert was more credible].)[26]

> c. *Substantial evidence supported the trial court's award of $494,497 in imputed income*

The trial court awarded the Madisons $494,497 as imputed net income they would have received if Casa W had been rented out during the 26-month period from April 2016 (when the receiver, Diamond, was appointed) through May 2018 (the

---

[26] Theodore also argues that Leh's analysis of the Company's expenses conflicts with the addendum signed by the Madisons in early 2006, in which they acknowledged that construction-related expenses had already far exceeded the $750,000 originally allotted in the purchase agreement. However, Kyle testified the Madisons relied on Theodore's representations as to the construction expenses, and Leh concluded (and the trial court found) that Theodore created a false need for funds in order to force the Madisons to sell him a majority interest in the Company "because of increased costs which were nonexistent." The addendum therefore is not evidence that the additional expenses claimed by Theodore were legitimate.

beginning of the trial). The court derived the amount of the award by multiplying Leh's estimate of the total net income Casa W would have generated during this period ($1,041,047) by 47.5 percent, which the court found to be the Madisons' interest in the Company.[27] Theodore contends it was error to impute income during this period because Casa W was subject to the exclusive control of Diamond, and Diamond chose not to rent out Casa W.

The trial court addressed Theodore's argument in the statement of decision: "While Theodore contends these funds should not be allowed because [Diamond] had control of the property, Theodore's conduct was the reason the previous court appointed [Diamond]. First, Theodore refused to cooperate in the rental of Casa W. Later, he removed the furniture in Casa W which would be necessary to rent the property. Judge Jessner had to order Theodore to replace it. Still, Theodore did not return all of the items to the house, prompting Judge Jessner to order [Diamond] to sell the house rather than rent it."

The trial court's finding that Theodore caused Casa W to be unavailable for rental was supported by substantial evidence. Diamond's September 2017 final report, which was admitted at trial without objection, stated that an "instance where Theodore sought to interfere with [Diamond]'s efforts to sell Casa W involved his removal of significant items of the [Company's] personal property located at Casa W which property was needed

---

[27] Leh calculated the net income Casa W would have generated after 2016 by using the average net income actually generated by Casa W during the period from June 1, 2014 through March 31, 2016. Theodore does not challenge Leh's measure of imputed income, only the basis for awarding it.

by [Diamond] to rent and sell Casa W." The improper removals occurred between April and May 2016 and included "the satellite boxes for the house's televisions, leather chairs and sofas, 11 alarm clocks, 9 bathroom mirrors, an outdoor cooler, 30 towels, washer and dryer, outdoor grill, cookware, 36 steak knives, 33 decorative pillows, cushions, and all of the propane tanks for the BBQ, fire pit, and outdoor heaters." A local property manager stated the items would have cost more than $15,500 to replace. The court ordered Theodore to return the items by July 1, 2016, although the majority of items were not returned until later in July.

At trial, Diamond similarly testified and his report reflected that he was unable to rent Casa W while pursuing a sale because of the missing items and because he had only limited funds on hand to operate Casa W. Although Theodore "ultimately" returned "most but not all" of the missing items in July 2016, Diamond's efforts to sell Casa W were frustrated by "the absence of books and records . . . [which] inhibited [Diamond's] ability or [his] brokers . . . to market the property as an income-producing property." Diamond also learned that Theodore transferred a Mexican title document from one Mexican bank to another, a process that Diamond was required to unwind to obtain a marketable title.

On appeal, Theodore contends that because he lacked legal authority to rent out Casa W, "the decision *not* to rent out Casa W during this period is attributable entirely to Diamond." Further, although Theodore's temporary removal of property "might have briefly delayed Casa W.'s sale, it did not prevent its rental." However, in 2016 the trial court (Judge Jessner) granted Diamond broad authority to sell the property and "sole

discretion" whether to rent it out during the period he was listing it for sale. At a subsequent hearing, the court ordered Diamond not to rent the property, and in August 2017 the court (Judge Alarcon) cancelled the pending sale of Casa W after declaring a mistrial.

Theodore does not cite any evidence for his contention that Diamond chose not to rent the property despite an ability to do so, and the trial court instead credited Diamond's contrary testimony that Theodore's interference prevented Diamond from marketing Casa W for rent or sale. We consider this evidence in the light most favorable to the judgment and do not reweigh the trial court's credibility determinations. (*Barickman, supra*, 2 Cal.App.5th at p. 516; see *DiPirro v. Bondo Corp.* (2007) 153 Cal.App.4th 150, 195 ["The testimony of witnesses who were apparently believed by the trier of fact may be rejected on appeal only if that testimony was physically impossible of belief or inherently improbable without resort to inferences or deductions."].)

> d. *The trial court did not err in awarding the Madisons $407,947 for their capital contributions in excess of $750,000*

The trial court awarded the Madisons $407,947, which Leh calculated as the amount of money the Madisons paid into the Company beyond their initial capital contribution of $750,000. The court found that under the terms of the operating agreement, no member was required to make contributions beyond $750,000 unless the Company's revenues were insufficient to pay its expenses, and "Theodore claimed the company's revenues were insufficient to pay its expenses and continued to demand

40

payments from . . . the Madisons but failed to substantiate at trial that the expenses exceeded revenues." Further, because the Madisons relied on Theodore's representations to make the additional contributions, absent a showing the Company operated at a deficit, the Madisons should not have been compelled to put in more money.

On appeal, Theodore advances three principal arguments to support his contention Leh improperly included excess capital contributions as part of her damages analysis.[28] First, he argues Leh's determination that Casa W generated more income than expenses was "based at least in part on her mistaken dismissal of the Gecko [s]tatements." But, as discussed, substantial evidence supported the trial court's finding that Leh's restated balances that excluded unverified expenses from the Company's books was more reliable than Zengler's approach of accepting all Gecko expenses without any verification.[29]

---

[28] Theodore does not dispute that $407,947 is a reasonable measure of the Madisons' excess capital contributions.

[29] In his opening brief Theodore argues Leh also failed to compare Casa W's expenses at the time of each capital contribution with the cash available at the time, instead reasoning with hindsight that Casa W's cumulative income exceeded its restated expenses. But, as the Madisons point out, Leh calculated the Company's restated cash on a rolling basis, as shown by her schedules admitted at trial, and the schedules showed a positive cash balance at the time of the Madisons' contributions. In his reply brief, Theodore appears to abandon this contention, arguing only that Leh's adjusted cash balances were flawed because she disregarded the expenses shown in the Gecko statements.

41

Second, Theodore argues the award must be reduced by at least $43,750 because the Madisons agreed in the addendum (which they signed in early 2006) to make an additional capital contribution of $43,750.  The relevant provision of the addendum states as follows:  "It is agreed that for the purchase price of $43,750, Madison will sell 2.5% of their shares to Theodore.  Madison will then put that $43,750 back into Casa W for further construction expenses."

As discussed, the trial court found in its statement of decision that Theodore "created a false need for funds" to force the Madisons to sell their shares to him, but the Madisons failed to insist that they see the Company's records before they signed the addendum giving up their 2.5 percent interest.  As a result, the court held the Madisons were bound by the agreement to decrease their share to 47.5 percent.  On this basis the court made a 2.5 percent downward adjustment to each of Leh's damages estimates (Leh had assumed 50-50 ownership and profit participation).  However, the court did not expressly address whether the Madisons were also bound by their further agreement to contribute the $43,750 proceeds from the sale of their shares to the Company to defray the purported (but false) additional construction costs.  In light of the trial court's findings that Theodore owed a fiduciary duty to the Madisons, controlled all relevant information, and fraudulently induced the Madisons to make additional contributions, we infer the court found the Madisons were not bound by their agreement to contribute the proceeds of their sale of their shares to the Company. (*Barickman, supra*, 2 Cal.App.5th at p. 516 [""'[T]he appellate court will "consider all of the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable

42

inference, and resolving conflicts in support of the [findings].""""].)[30]

Third, Theodore argues that if the Madisons' additional capital contributions are returned as part of their damages, their interest in the Company must be significantly reduced because, under the operating agreement, their additional contributions sustained their relative percentage (given Theodore's additional contributions beyond $750,000). This argument fails, however, because the trial court found the demand for contributions was predicated on fraudulent reports of operating losses. If Theodore had not lied about the Company's balances and inflated expenses, additional contributions would not have been necessary for the Madisons to maintain their percentage. For the same reason, Theodore's argument that he should receive a damages offset for *his* additional capital contributions is without merit.

---

[30] Theodore relatedly argues he should have received a $125,000 reduction in damages under two other provisions of the addendum. Paragraph 2 of the addendum states that "[a]s an addendum to the acquisition and managerial fees" in the operating agreement, "Theodore shall receive 10% of construction costs, which . . . [are] $750,000" (i.e. $75,000). Paragraph 3 states, "Theodore has placed out of pocket monies into Casa W construction costs totaling approximately $50,000 to date" and "Theodore shall be repaid this money . . . from 100% of the net rental income until paid off." There is no indication in the statement of decision that the trial court found the Madisons were bound by these provisions, and there is no evidence from which we can infer the court omitted a $125,000 credit to Theodore by mistake.

e. *Theodore forfeited his argument Leh failed to account for depreciation of the Casa W renovation expenses, and in any event, he has not met his burden to show Leh failed to account for depreciation*

A key element of Leh's methodology was to treat Casa W purchase and renovation expenses as capitalized costs.[31] Specifically, in restating the Company's balances, Leh excluded more than $2.1 million in expenses from the profit and loss account (income statement) over the period from 2005 through 2009.[32] Leh's rationale was that the Company's principal income-earning asset was Casa W, and thus the costs of acquiring and improving Casa W should have been placed on the balance sheet. On appeal, Theodore does not challenge the validity of Leh's cost-capitalization approach; instead, he argues that Leh failed to make any allowance for depreciation in her model. He contends in his opening brief that Leh should have reduced Casa W's net income over the 14-year period between 2005 and 2018 to reflect depreciation expenses of approximately $1.1 million based pro rata on a 27.5 year straight-line depreciation approach he claims is commonly used for tax accounting in the United States. We agree with the Madisons that Theodore has forfeited his challenge to Leh's calculation by failing to raise depreciation at

---

[31] "Capitalize" in this context means "[t]o treat (a cost) as a capital expenditure rather than an ordinary and necessary expense." (Black's Law Dict. (12th ed. 2024) p. 259.)

[32] Leh removed approximately $2.1 million from the income statement, including approximately $983,000 for the purchase of Casa W, $123,000 spent on construction, $59,000 for furnishings, and $949,000 for remodeling expenses.

44

trial or (adequately) in his motion for a new trial. And even if Theodore did not forfeit the argument, it lacks merit.

Theodore did not raise depreciation of capitalized costs at trial through Zengler's testimony or in Theodore's cross-examination of Leh. In Theodore's February 2021 new trial motion, he argued (under the heading "Failure to Properly Account for Capitalized Expenditures") that Casa W construction costs, if not treated as expenses, "should have been capitalized as assets, recognized on the balance sheet, and then depreciated over time." However, this is the only reference in the motion to depreciation, and Theodore failed to provide any evidence (expert or otherwise) to support his contention that the renovation expenses should have been depreciated in Leh's analysis or what the amount of depreciation should have been as an adjustment to damages.[33] Indeed, Theodore contends for the first time on appeal that the capitalized renovation costs should have been depreciated based on citations to the Internal Revenue Code (26 U.S.C. § 1 et seq.) and a United States Tax Court memorandum decision that held "[f]or property placed into service after 1986 . . . , the [Internal Revenue] Code generally requires the use of the Modified Accelerated Cost Recovery

---

[33] The Madisons did not address Theodore's depreciation argument in their opposition to the new trial motion. In denying the new trial motion, the trial court also did not address the argument. The court ruled more generally, "There is no evidence provided in this motion by means of affidavit or declarations . . . in support [of the argument] that Ms. Leh's assumptions or methodology were based upon conjecture, or that there was the alleged analytic gaps in the data and opinion, such that the court 'clearly should have reached a different verdict or decision.' ([§ 657].)"

45

System (MACRS)," and for "[r]esidential rental property . . . MACRS specifically requires use of the straight-line method and a recovery period of 27.5 years." (*AmeriSouth XXXII, Ltd. v. Comr.* (2012) 103 T.C.M. (CCH) 1324 [T.C. Memo 2012-67, pp. *12, *13], citing 26 U.S.C. § 168(b)(3)(B).)  Theodore also offers for the first time on appeal a mathematical calculation that a 3.64 percent depreciation over 14 years would equal approximately $1.1 million.  Theodore has forfeited this contention on appeal.  (*Cabatit v. Sunnova Energy Corp.* (2020) 60 Cal.App.5th 317, 322 (*Cabatit*) ["If a party fails to raise an issue or theory in the trial court, we may deem consideration of that issue or theory forfeited on appeal."]; *Quiles v. Parent* (2018) 28 Cal.App.5th 1000, 1013 (*Quiles*) ["'Failure to raise specific challenges in the trial court forfeits the claim on appeal.'"].)

Even if Theodore had not forfeited this contention, Leh's opinion testimony was not in the context of a tax dispute, and there is no evidence the Company did or was required to comply with federal tax accounting principles, let alone with the MACRS default rules for residential rental property.  On this record, Theodore has not shown that Leh's analysis was speculative, remote, or conjectural or that her assumptions were not supported by the record.  (*Wise, supra*, 220 Cal.App.4th at pp. 1191-1192.)  Further, there was no evidence at trial upon which the trial court could have ordered a $1.1 million reduction in damages.

f.      *Theodore has failed to show that the trial court erroneously excluded $754,361 in expenses associated with Casa W service income*

Theodore argues that Leh recharacterized $864,376 of gross cash receipts that had been deposited into Casa Theodore's accounts as income properly belonging to the Company based on services provided to guests staying at Casa W, but in so doing, Leh failed to deduct expenses of $754,361 required to generate that service income.  Theodore observes that profit margins on hospitality services are slim, around 10 percent, and the trial court erred in embracing a damages analysis that considered only gross service income.  However, there is substantial evidence in the trial record that Leh considered validated service-related expenses and no credible evidence she omitted service-related expenses totaling $754,361.  In any event, Theodore failed to show that any component of the damages awarded by the trial court based on Casa W income failed to include expenses.

Theodore cites a single trial document for his assertion there were $754,361 in service expenses that should have been deducted from Casa W's gross service income of $864,376.  In table 3 of Zengler's "summary of economic damages" admitted at trial, Zengler reported that Leh identified $864,376 in "Casa W income deposited in Casa T accounts" in her damages analyses. (Capitalization omitted.)  Zengler opined this amount should have been limited to $110,015 based on the following annotation in table 3: "First Deposition.  Leh did not look at expenses incurred on deposits (-$754,361)."  Zengler was asked about this entry at trial and testified, "These figures are basically from my first deposition. . . .  In both of Ms. Leh's reports [in the 2015 trial and 2018 trial] she looks at Casa W deposits into Casa T

47

accounts. She simply moves the deposits or the top line over to Casa W[] but she doesn't move the expenses. So in my first report, I tallied up the expenses which came to $754,361. That leaves a net of $110,015."

Zengler's entry on table 3 and testimony are insufficient to show the trial court erred in relying on Leh's calculation of Casa W's income that was deposited into Casa Theodore's accounts. As a threshold matter, Zengler's deposition testimony was not introduced at trial, nor were there any schedules or additional testimony showing how Zengler calculated the expenses he noted on table 3. Further, as discussed, the court expressly found Leh's testimony "more credible and reliable than Zengler's critiques," and Zengler did not attempt to verify the information he received from Theodore. Accordingly, there is no evidence in the record to substantiate Zengler's assertion there were $754,361 in expenses that should have been deducted.

In addition, Zengler's damages chart (table 3) and testimony are not relevant to the trial court's award, which relied on Leh's 2018 analysis. Although Leh in her 2015 report recharacterized $864,376 in Casa Theodore deposits as Company income—based on Wax-Semus's analyses of the limited bank records then available—in 2018 Leh took a different approach based on new information. By then, Leh had received the Company's QuickBooks and additional documentation, and she engaged in a substantially different approach to restating the Company's cash balance. In Leh's 2018 analysis, she never opined there were $864,376 in Casa Theodore deposits that belonged to Casa W; instead, as discussed, she went through a process of validating certain expenses and excluding others in restating the Casa W account. Leh testified as to service

48

expenses, "If the expenses for the service contract [were] included on the Casa Theodore, Inc., property manager profit and loss statement, then the expenses would be included in my analysis." As an example, Leh described at trial how she recharacterized two entries labeled "event fees" in Theodore's QuickBooks as service income belonging to Casa W, but she also made entries in the restated balance for "event direct costs to show . . . the costs related to those – that service income." Theodore has not pointed to a single instance where Leh omitted a service expense in her 2018 damages analysis, let alone that the award omitted $754,361 in service expenses. (*LNSU #1, supra*, 94 Cal.App.5th at p. 1070 [appellant has the burden to provide an adequate record and citations to the record to show appealable issue].)

### g. *Leh's treatment of Mexican taxes was reasonable based on the evidence*

Theodore contends Leh erred in computing the Company's restated balances because she declined to make any deductions for local hospitality taxes, Mexican value added tax (impuesto al valor agregado, or IVA), and Mexican income taxes. Zengler opined that between January 2005 and March 2016 the aggregate hospitality tax billed to Casa W was $40,786 and the IVA was $224,990, based on entries in QuickBooks. Theodore asserts (for the first time) in his opening brief that the Mexican income taxes owed on the Madisons' portion of Casa W restated income would have been $160,347 at a 30 percent tax rate. Theodore argues that taxes are inevitable in life[34] and it must

---

[34] Based on Benjamin Franklin's quote in 1789 that "nothing is certain except death and taxes."

have been error to exclude them. But Theodore did not provide evidence at trial showing any of these taxes were paid.

Leh stated in her report and testified during cross examination that she did not make deductions for the Mexican taxes because Theodore never produced any Mexican tax returns, and there was no other evidence (such as cancelled checks) showing the taxes were ever paid. Leh also noted the Company's United States tax returns for the years 2005 through 2014 did not reflect a deduction for the payment of foreign taxes. Zengler admitted in cross-examination that he did not see any evidence the Mexican taxes were paid.

Zengler opined that the presence of tax liabilities in QuickBooks required that Leh include the taxes on her restated cash balance without regard to when (or whether) they were ever paid, because Leh used accrual-basis accounting (rather than cash-basis accounting), which requires that an expense be recorded when the expense is incurred, not when it is paid. But Zengler misapprehends Leh's forensic analysis: The germane question for her fraud examination was whether the Mexican taxes were actually paid, not how they were recorded in QuickBooks. Leh's position was that there was no evidence they actually were paid, and Zengler admitted as much, so she properly excluded the tax entries as unsupported expenses. Leh's approach therefore had "evidentiary support and [was] accompanied by a reasoned explanation connecting the factual predicates to the ultimate conclusion." (*San Diego Gas & Electric Co. v. Schmidt, supra*, 228 Cal.App.4th at p. 1292.) The trial court found her approach more credible than Zengler's approach, and we do not second-guess that finding.

50

The trial court awarded the Madisons $302,770 as their share of the income Casa W would have earned on rentals that Theodore directed instead to Casa Theodore in violation of the noncompete clause of the operating agreement. Leh calculated that Casa Theodore earned $637,411 between January 2006 and December 2015 during periods that Casa W was available for rent. On appeal, Theodore contends the trial court erred in awarding any Casa Theodore rental income to the Madisons, arguing the Madisons understood and agreed that Theodore would continue to rent out Casa Theodore while operating Casa W; renters freely chose which house to rent; and the trial court improperly shifted the burden to Theodore to prove Casa Theodore rentals were reasonable and fair to Casa W. These contentions lack merit.

The operating agreement specified that Theodore owed the Company a duty of loyalty, including an obligation to "refrain from competing with the Company in the conduct of the Company business." It is undisputed that Casa Theodore was rented during periods when Casa W was available for rent, and there was trial testimony that the two properties were comparable. Theodore's principal argument is that Kyle understood from the outset of their partnership that Theodore would continue to actively market Casa Theodore alongside Casa W. To the contrary, Kyle testified it was his understanding based on Theodore's representations at the time of the investment that "Casa W would be the primary house for rent and Casa Theodore

51

could not be rented if Casa W was available." Kyle explained, "I knew the purpose of Casa Theodore was to be rented before we purchased Casa W. However after we purchased Casa W, [Theodore] didn't want to rent . . . Casa Theodore because of the wear and tear. He said that's why we're getting Casa W so we can focus on rentals on that and have less rentals on Casa Theodore." The trial court found Kyle was credible and Theodore was not, and in reviewing the record for substantial evidence, we accept the trial court's credibility determinations and do not reweigh the evidence. (*Barickman, supra*, 2 Cal.App.5th at p. 516.)

Theodore also argues that it was the renters, not Theodore, who chose which villa they wanted to rent, and the trial court erroneously stated it was Theodore's burden as a fiduciary to disclose and prove that the rental transactions involving Casa Theodore were fair and reasonable to the Company. Leh's analysis of the rentals of the two properties supported a finding that Theodore and his agents actively marketed and rented Casa Theodore on frequent occasions when Casa W was available in violation of the non-compete clause. Therefore, the Madisons met their burden to show Theodore breached his fiduciary duty to the Company by actively competing with Casa W. Theodore did not argue or present evidence in his defense to show that it was the renters' preference for Casa Theodore, and not his active marketing, that resulted in rental of Casa Theodore when Casa W was available. Even assuming the trial court incorrectly stated in its statement of decision that Theodore had the burden to show the Casa Theodore rentals were fair to Casa W, this misstatement was harmless because the Madisons met their

burden to present substantial evidence that Theodore violated the non-compete clause by his rental of Casa Theodore.[35]

> i. *The trial court miscalculated the Madisons' share of "unidentified" income in Theodore's accounts; we modify the award to reduce this income from $377,704 to $372,265*

Leh, based on Wax-Semus's accounting, opined that $799,166 deposited into Theodore's personal bank accounts and in Casa Theodore's accounts was "unidentified" income, i.e., income that could not be linked to income-producing activities by Theodore or Casa Theodore, and it therefore should be distributed pro-rata to the Madisons as presumed Casa W income. The trial court ultimately awarded the Madisons $377,704 in "unidentified income assumed to belong to Casa W."

In the statement of decision, the trial court explained that after the trial, the court asked the parties for additional briefing "focusing on items that may have been erroneously included as belong[ing] to Casa W to avoid appellate issues on items that

---

[35] Theodore also argues Leh erred in imputing $19,088 in Casa Theodore income received in 2005, when renovations to Casa W were still underway and it could not be rented out. But Theodore relies on his attorneys' examination of Leh about potential flaws in a schedule prepared by Wax-Semus in the first trial. There is no evidence that Leh relied on that schedule in calculating $302,770 in imputed income, which she instead calculated by tabulating Casa Theodore rental income in 2006. Theodore has not met his burden as appellant to "affirmatively establish prejudicial error by providing an adequate record, citing to the record, and presenting a persuasive argument." (*LNSU#1, supra*, 94 Cal.App.5th at p. 1070.)

could be resolved at the trial level." In response, the Madisons abandoned their claim to two income items: rent Theodore received for renting out his Malibu guesthouse and a reimbursement of arbitration fees paid in an unrelated matter. Except for these two items, the court found, "None of the other items disputed by Theodore [has] been properly documented so they are included as items of damages as income."

On appeal, Theodore contends the trial court made a mathematical error that overstated the damages by more than $5,000. Theodore cites Leh's testimony and Wax-Semus's report to argue that the two items conceded by the Madisons to be legitimate income to Theodore were valued at $15,450: $11,450 for the Malibu rent and $4,000 for the refund in arbitration fees. Thus, the court should have awarded the Madisons only $372,265 ($783,716 [the unidentified income of $799,166 less $15,450] × 0.475 [applying the Madisons' 47.5 percent ownership interest]).[36]

We agree the $377,704 award is not supported by the trial court's evidentiary findings because the court apparently failed to deduct the Malibu rent that the Madisons conceded was

---

[36] The Madisons argue Leh did not opine that the Malibu rent and arbitration fee refund were worth $11,450 and $4,000, respectively; rather, Leh was asked to assume these facts. This is not accurate. The $11,450 and $4,000 figures were reflected in Wax-Semus's schedules and relied on by both Leh and Zengler. Leh was asked instead to assume the items were *legitimate* Theodore income. As discussed, the trial court expressly found the Madisons gave up their claim to these two items after the trial.

legitimate income belonging to Theodore.[37]  In light of the court's clear finding in the statement of decision that it intended to include a deduction for the $11,450 in Malibu rent as well as the $4,000 arbitration fees, we modify the award of "unidentified" income to $372,265.

>            j.      *Theodore forfeited his argument the trial court*
>                    *erred in calculating a credit to Theodore for the*
>                    *costs of selling Casa W*

In its statement of decision, the trial court gave Theodore a $266,000 credit as an offset against the Madisons' damages "for transferring Casa W to the Madisons," comprising "$165,000 taxes (Theodore's 50%, share), $50,000 for repairs, $44,000 agent fees (Theodore's 50% share), and $25,000 Misc. expenses."[38]  On appeal, Theodore contends that "[t]he record does not support the trial court's calculation of this credit, which appears to be based on numbers plucked entirely out of thin air" due to "a hypothetical sale of the Casa W property and then deduct[ing] certain hypothetical expenses."  Theodore argues the fair market value of Casa W was $1.1 million based on the "[as-is]" price that

---

[37]      Applying the trial court's formula with a deduction for the arbitration refund but mistakenly omitting any deduction for the Malibu rent yields precisely $377,704 ($795,167 [i.e., $799,167 less $4,000] × 0.475).

[38]      The trial court divided the Casa W sale costs evenly.  It is not clear whether Theodore or the Madisons should have received the benefit of a 2.5 percent adjustment to the sales costs, insofar as the court was reimbursing Theodore for the share of costs he would bear that would actually benefit the Madisons.  In any event, Theodore does not argue the court applied the wrong percentage, and the issue is forfeited.

Diamond had negotiated in 2017, and accordingly, the record supported a commission of no more than $66,000 (6 percent of $1.1 million as a "standard real estate broker's commission"), minimal repair costs, and no taxes (because, according to Theodore, the property's cost basis would nearly equal its net purchase price after accounting for capitalization of renovation costs and depreciation). Theodore argues he should have instead received an offset of $529,725, which he calculates as $1.1 million for the sale of Casa W less $66,000 for the broker commission and $25,000 in closing costs, and no reduction for taxes or repairs, all multiplied by 52.5 percent.

As a threshold matter, Theodore misconstrues the statement of decision. The trial court calculated Theodore's offset as the costs that would likely be incurred in connection with the sale of Casa W. To the extent Theodore argues on appeal the court overstated these costs, the court's higher cost estimates benefited Theodore (ironically) with a larger offset. If the sales costs were limited, as he argues, to only $91,000 ($66,000 commission plus $25,000 closing costs), then Theodore should receive an offset of less than $50,000, rather than $266,000. The gravamen of Theodore's argument is not that the sales costs are excessive, but that he should have instead received an offset for his share of the *proceeds* of the sale of Casa W (after deducting the sales costs). But this is not what the court ordered, and it is inconsistent with the judgment, in which the court ordered the proceeds of the sale of Casa W to be applied to satisfy the money judgment against Theodore, with any surplus proceeds divided pro rata with the Madisons. In other words, in the final disposition, Theodore will be credited with the entire value of Casa W to offset the Madisons' money damages.

56

The trial court ordered the $266,000 offset benefiting Theodore in its July 2020 statement of decision, and again in the November 2020 amended statement of decision. There is no evidence in the record before us that Theodore challenged the method for calculating or the amount of the offset in the statements of decision. (See *LNSU#1, supra*, 94 Cal.App.5th at p. 1070.) In the new trial motion filed in February 2018, Theodore raised more than 20 discrete challenges to the damages award, but he did not address the court's offset for Casa W sales costs. The court and the parties were thus denied an opportunity to explore the court's method in determining the offset, and there is no evidence in the record supporting the assumptions Theodore raises for the first time on appeal, such as the probable sales price and condition of Casa W at the time of the appeal, standard agency commissions for Mexican villas, repair costs, precise adjustments to the cost basis, and multistate taxation issues. In short, Theodore has forfeited the issue. (*Cabatit, supra*, 60 Cal.App.5th at p. 322; *Quiles, supra*, 28 Cal.App.5th at p. 1013.)

Theodore argues in his reply brief that we should not apply forfeiture here, because his challenge is to the substantiality of the evidence supporting the judgment, and not a claim of excessive damages. (See, e.g., *Tahoe National Bank v. Phillips* (1971) 4 Cal.3d 11, 23, fn. 17 ["Generally, points not urged in the trial court cannot be raised on appeal. [Citation.] The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule."]; *In re P.C.* (2006) 137 Cal.App.4th 279, 288 [same].) But, as discussed, Theodore's argument is not that substantial evidence did not support a judgment for the Madisons, it is that the trial court should have

given him an offset for his share of the Casa W sales proceeds. Moreover, even if the issue were not forfeited, it was Theodore's burden to prove an offset, and substantial evidence does not support the larger offset that Theodore seeks. (*Conrad v. Ball Corp.* (1994) 24 Cal.App.4th 439, 444 ["A defendant seeking an offset against a money judgment has the burden of proving the offset."]; accord, *Textron Financial Corp. v. National Union Fire Ins. Co.* (2004) 118 Cal.App.4th 1061, 1077 [same], disapproved of on another ground in *Zhang v. Superior Court* (2013) 57 Cal.4th 364.)

> k. *The award of prejudgment interest must be reduced to $1,471,332 to account for the modified damages*

The trial court awarded the Madisons $1,486,631 in prejudgment interest based on an aggregate damages award of $2,736,119.[39] Although the statement of decision does not set forth the court's interest calculation, the award corresponds with the Madisons' proposals in posttrial briefing on damages.[40] In pertinent part, the Madisons asked the court to award $223,767 in interest based on damages of $377,704 for the Madisons' share of "unidentified" income in Theodore's accounts. In schedules

---

[39] It appears the prejudgment interest award was based on all the components of damages except the imputed income to Casa W after 2016, when the Company was in receivership and not rented.

[40] We augment the appellate record on our own motion to include the "Madisons' Response to Theodore's Post-Trial Brief on Damages" filed in the superior court on January 21, 2021. (Cal. Rules of Court, rule 8.155(a)(1)(A).)

attached to their posttrial damages brief, Leh calculated the interest by multiplying the damages by 10 percent annual statutory interest, and then prorating the interest over the 2,044-day period between May 27, 2014 and December 31, 2019.

On appeal, Theodore does not challenge Leh's methodology for computing prejudgment interest or the relevant accrual period or interest rate; rather, he challenges the interest award only on the basis that the underlying damages award must be reversed or reduced.[41] As discussed, we agree with Theodore that the trial court erred in awarding $377,704 in unidentified income in Theodore's bank accounts to the Madisons, and we reduce this damages component to $372,265. It also appears Leh erred in her interest analysis: although she stated (correctly) in a summary schedule that she adjusted the "unidentified" income award and interest to reflect the Madisons' 47.5 percent ownership share, in her underlying interest computation she continued to use the 50 percent ownership interest that the court had rejected.

In light of both the reduction in the underlying damages and to correct for Leh's error with respect to the ownership interest, the prejudgment interest awarded in connection with the unidentified income in Theodore's bank account must be

---

[41] On November 27, 2024 we ordered the parties to file supplemental briefs addressing the proper formula to calculate prejudgment interest if we were to modify the trial court's award of "unidentified income." In their responses, both parties agreed Leh's formula was the correct formula, although Theodore disputes the correctness of the underlying damages and notes (correctly) that Leh miscalculated the Madisons' share of those damages in her posttrial interest computation.

reduced to $208,468. Our modified number in the formula is in bold. The revised calculation is as follows:

$$\frac{\$\mathbf{372,265} \ \times 0.10 \ [10\% \text{ per annum}]}{365 \text{ days}} \times 2{,}044 \text{ days} = \$208{,}468$$

Consequently, the trial court's aggregate award of prejudgment interest must be reduced by $15,299, which is the difference between the prejudgment interest awarded on the unidentified income in Theodore's bank account ($223,767) and the corrected interest ($208,468), thereby reducing the total prejudgment interest award from $1,486,631 to $1,471,332.

B.    *The Madisons' Cross-appeal (Case No. B310551)*

The Madisons contend the trial court erred in entering judgment for Theodore on their cause of action for conversion. In its statement of decision, the court ruled, "Money can only be the subject of conversion if it is a specifically identifiable fund or corpus for which the defendant had an obligation to keep intact or deliver the specific money in question. [Citation.] No such identifiable fund or corpus exists here." The Madisons argue the court's findings that Theodore was the Madisons' fiduciary and he diverted Casa W rental income into his personal accounts were sufficient to establish conversion. We disagree. Although the Madisons were entitled to a share of Company profits, they did not have a possessory interest in Casa W rent payments, and the court did not err in ruling there was no conversion.[42]

---

[42]    As noted, the Madisons filed a motion to amend the complaint to add a cause of action for conversion to conform to

60

1. *Governing law and standard of review*

"[T]he tort of conversion is understood more generally as 'the wrongful exercise of dominion over personal property of another.' [Citations.] [¶] As it has developed in California, the tort comprises three elements: '(a) plaintiff's ownership or right to possession of personal property, (b) defendant's disposition of property in a manner inconsistent with plaintiff's property rights, and (c) resulting damages.'" (*Voris v. Lampert* (2019) 7 Cal.5th 1141, 1150 (*Voris*); accord, *Hodges v. County of Placer* (2019) 41 Cal.App.5th 537, 551.) The property subject to a conversion claim "need not be tangible in form" and may include monetary interests; however, "the law has been careful to distinguish proper claims for the conversion of money from other types of monetary claims more appropriately dealt with under other theories of recovery. Thus, although our law has dispensed with the old requirement that 'each coin or bill be earmarked,' it remains the case that 'money cannot be the subject of an action for conversion unless a specific sum capable of identification is involved.'" (*Voris*, at p. 1151.)

"Equally important, the 'specific thing' at issue [citation] must be a thing to which the plaintiff has a right of ownership or possession—a right with which the defendant has interfered by virtue of its own disposition of the property. This means that '[a] cause of action for conversion of money can be stated only where

___

proof near the end of trial. The motion, any written opposition, and the proposed or conformed amended pleading are not in the appellate record. Because we hold the trial court did not err in entering judgment against the Madisons on the conversion claim, we do not reach Theodore's contention in his cross-respondent's brief that the Madisons' motion to amend was untimely.

a defendant interferes with the plaintiff's *possessory interest* in a specific, identifiable sum.'" (*Voris, supra*, 7 Cal.5th at p. 1151, quoting *Kim v. Westmoore Partners, Inc.* (2011) 201 Cal.App.4th 267, 284 ["A cause of action for conversion of money can be stated only where a defendant interferes with the plaintiff's *possessory interest* in a specific, identifiable sum, such as when a trustee or agent misappropriates the money entrusted to him."]; accord, *McKell v. Washington Mutual, Inc.* (2006) 142 Cal.App.4th 1457, 1491 ["Money cannot be the subject of a cause of action for conversion unless there is a specific, identifiable sum involved, such as where an agent accepts a sum of money to be paid to another and fails to make the payment."].) Thus, "'California cases permitting an action for conversion of money typically involve those who have misappropriated, commingled, or misapplied specific funds held for the benefit of others.'" (*Kim*, at p. 284; accord, *PCO, Inc. v. Christensen, Miller, Fink, Jacobs, Glaser, Weil & Shapiro, LLP* (2007) 150 Cal.App.4th 384, 395-396.) Conversely, "no claim for conversion is stated where money was allegedly misappropriated 'over time, in various sums, without any indication that it was held in trust for' plaintiff." (*Kim*, at p. 285, quoting *Software Design & Application, Ltd. v. Hoefer & Arnett* (1996) 49 Cal.App.4th 472, 485.)

Conversion is a "'strict liability tort.'" (*Voris, supra*, 7 Cal.5th at p. 1150.) Damages include the value of the property at the time of conversion, plus interest, or an amount sufficient to indemnify the plaintiff for losses proximately caused by the conversion, and "[a] fair compensation for the time and money properly expended in pursuit of the property." (Civ. Code, § 3336; see *Voris*, at pp. 1150-1151.) Punitive damages are also recoverable "upon a showing of malice, fraud, or oppression," and

62

"emotional distress damages are also recoverable by the victim of conversion in appropriate circumstances." (*Voris*, at p. 1151.)[43]

The Madisons' cross-appeal raises a legal question regarding the scope of the conversion tort based on the trial court's factual findings (which are undisputed for this purpose), which we review de novo. (See *Guardianship of Saul H.* (2022) 13 Cal.5th 827, 846-847 ["'the application of law to undisputed facts ordinarily presents a legal question that is reviewed de novo'"]; accord, *Boling v. Public Employment Relations Bd.* (2018) 5 Cal.5th 898, 912-913 [same]; see also *Saul H.*, at p. 847 ["our review is de novo when 'the question is predominantly legal' and 'requires a critical consideration, in a factual context, of legal principles and their underlying values'"].)

> 2. *The trial court did not err in finding Theodore's misappropriation of Casa W rental income did not constitute conversion*

The Madisons cite the following factual findings by the trial court as support for their conversion claim: (1) "Theodore, as a trustee, owed the Madisons, as beneficiaries, the duty of utmost loyalty and honesty"; (2) "Theodore was [a] fiduciary with the Madisons"; (3) "[N]o rental profits . . . should have ever been deposited in any account other than the Casa W LLC bank accounts and they should have been shared consistent with percentage interests of the members"; (4) Theodore "deposit[ed]

---

[43]    During the trial, the Madisons' lawyer indicated the cause of action for conversion would entitle the Madisons to recover for the time and expense Kyle devoted to trying to ascertain the Company's genuine financial status and for his emotional distress.

63

[Company] [f]unds into his personal and business bank accounts";
(5) "Theodore diverted [Company] rental income to his personal
bank accounts"; and (6) "Leh determined that [Theodore] diverted
Casa W funds."[44] (Boldface omitted.)

There is no conversion under these facts because Theodore,
in diverting LLC rental income, did not interfere with the
Madisons' "*possessory interest* in a specific, identifiable sum.'"
(See *Voris, supra*, 7 Cal.5th at p. 1151; *Kim v. Westmoore
Partners, Inc., supra*, 201 Cal.App.4th at p. 284.) As set forth in
the Company purchase agreement under the heading "Profit
Sharing," "Theodore and the Madisons shall equally share profits
with Theodore receiving fifty percent (50%) of all profits and [the]
Madisons receiving fifty percent (50%) of all profits. Profits
gained from the property include, but are not limited to, rental
profits, sale of the property and any other income that are
derived from the property." The addendum reduced the
Madisons' profit sharing and equity interests to 47.5 percent, but
it did not change the fundamental profit-sharing mechanism.
Under the governing agreements, the Madisons had no
possessory interest in the rental payments the Company received
or should have received but for Theodore's diversion. The
Company was obligated to pay Casa W operating expenses, and
even net rental income was not earmarked for distribution to the

---

[44] The Madisons do not argue on appeal (nor is it evident that
they argued below) that Theodore converted their equity in the
Company. Their claim, as described in their cross-appellants'
brief, is limited to conversion of Casa W rental income. Any
contention Theodore converted Company equity is forfeited.
(*Cabatit, supra*, 60 Cal.App.5th at p. 322; *Quiles, supra*,
28 Cal.App.5th at p. 1013.)

Company's members; rather, the Madisons were entitled to a percentage of the Company's aggregate profit. While it is true the trial court made findings Theodore was a "trustee" for the purposes of the Madisons' claims for breach of a fiduciary duty and accounting, there was no finding Theodore misappropriated money the Madisons entrusted to him for safekeeping, nor that he "accept[ed] a sum of money to be paid to another and fail[ed] to make the payment." (*McKell v. Washington Mutual, Inc., supra*, 142 Cal.App.4th at p. 1491.)

*Voris* is instructive. The Supreme Court there held that a terminated employee could not assert a conversion claim for unpaid wages against an owner of the company that employed him, despite the owner's promise to pay the wages. (*Voris, supra*, 7 Cal.5th at pp. 1145-1146, 1162.) The court reasoned, "The employee's claim is not that the employer has wrongfully exercised dominion over a specifically identifiable pot of money that already belongs to the employee—in other words, the sort of wrong that conversion is designed to remedy. Rather, the employee's claim is that the employer failed to reach into its own funds to satisfy its debt." (*Id*. at pp. 1152-1153.) The court contrasted the allegations before it, which were cognizable as claims against the employer for breach of contract, Labor Code violations, and other theories, but not conversion, with circumstances where an employer's withholdings might be conversion: "Take, for instance, an employer that pays wages but then removes the money from an employee's account, or that diverts withheld amounts from their intended purposes; that employer may well have committed conversion." (*Id.* at p. 1156, fn. 11.) The court likewise approved California cases finding a real estate agent could be liable for conversion "where he had

65

accepted commissions on behalf of himself and a business partner, but refused to give the partner his share"; where a sales agent received "proceeds from a consignment sale" and "did not remit any portion of the proceeds to the principal seller"; and where the client of an attorney kept "attorney fees received as part of a settlement, where a lien established the attorney's ownership of the fees in question." (*Id.* at p. 1152, citing *Sanowicz v. Bacal* (2015) 234 Cal.App.4th 1027, 1042, *Fischer v. Machado* (1996) 50 Cal.App.4th 1069, 1072-1074, and *Weiss v. Marcus* (1975) 51 Cal.App.3d 590, 599.) In all of these scenarios, even though the plaintiff did not previously hold the diverted money and entrust it to the defendant, the money was clearly earmarked for the plaintiff at the time it came under the defendant's control and was misdirected. That was not the case with Casa W rental payments.

*SP Investment Fund I LLC v. Cattell* (2017) 18 Cal.App.5th 898, relied upon by the Madisons, is distinguishable. There, SP sued Cattell for breach of contract and conversion in connection with SP's written agreement to buy Cattell's interest in a limited partnership; as alleged, the agreement included a term that Cattell would hold partnership distributions made before the closing date in trust for the benefit of SP. (*Id.* at pp. 901-902.) SP paid the full purchase price, the partnership refused to approve the transaction, and Cattell refused to turn over distributions paid in the interim. (*Id.* at p. 902.) Reversing a motion for judgment on the pleadings in favor of Cattell, the Court of Appeal held that SP stated a claim for conversion: "In this case, SP alleges that Cattell received monetary distributions from the [p]artnership that, under the [a]greement, he held in trust for SP's benefit and he has refused to turn those funds over

66

to SP.  Its conversion claim, therefore, is not a generalized claim for money but rather a claim for a specific identifiable sum of money *received by Cattell for SP's benefit.*"  (*Id.* at p. 907 (italics added).)  As discussed, there is no provision in the purchase agreement (or any other agreement governing the Company) stipulating that Theodore would collect and hold the Company's rental income in trust for the Madisons.  Theodore engaged in fraud, breach of contract, and breach of fiduciary duty by denying the Madisons the returns on their investment, but the trial court did not find he diverted profit distributions earmarked for the Madisons.

C.     *Theodore's Appeal from the Order on Costs*
       *(Case No. B313727)*

Theodore appeals from the trial court's May 4, 2021 order awarding the Madisons approximately $160,000 in statutory costs.[45]  (§§ 1032, subd. (b); 1033.5, subd. (a).)  Theodore contends the trial court erred in awarding $84,971 for the preparation of hearing and trial transcripts that were not ordered by the court; $2,400 for bond premiums incurred by the Madisons in a

---

[45]     In his opening brief, Theodore asserts (without any citation to the record) that the trial court awarded the Madisons approximately $130,000 in costs.  The court's May 4, 2021 order did not state the total cost award, specifying only the amount of costs the court taxed.  By our calculations, the court awarded the Madisons $160,124.72 in costs, which is based on the total amount claimed by the Madisons in their cost memorandum ($792,181.55) less the cost items expressly taxed by the court ($632,056.83).  During oral argument Theodore's attorney stated he followed a similar process in calculating $130,000, although he does not explain his calculations in his brief.

67

separate action for a preliminary injunction; and $32,647 in expert witness fees paid to Wax-Semus, who was later disqualified.[46] We agree with Theodore the bond premium and transcript costs were not recoverable and the court abused its discretion in awarding them. However, the court did not abuse its discretion in awarding the expert witness fees paid to Wax-Semus, which were incurred before her disqualifying conduct given the court's finding that Wax-Semus produced work product that was unbiased and necessary to the litigation. We therefore reverse the May 4, 2021 order with respect to the court's denial of Theodore's motion to strike $84,971 in transcript fees and $2,400 in bond premiums.

1.      *Relevant procedural background*
    a.      *The Madisons' cost memorandum*

On January 26, 2021 the Madisons filed a verified memorandum of costs on Judicial Council Form MC-010 seeking $792,182 in costs (cost memorandum).[47] The Madisons entered

---

[46]     Theodore also contends the cost award should be reversed altogether because the underlying judgment should be reversed. Because we affirm the judgment and the majority of the damages, the Madisons are the prevailing party in the action and are entitled to statutory costs. (See § 1032, subd. (a)(4) ["'Prevailing party' includes the party with a net monetary recovery . . ."]; *id.*, subd. (b) ["Except as otherwise expressly provided in statute, a prevailing party is entitled as matter of right to recover costs in any action or proceeding."].)

[47]     The cost memorandum did not enumerate the Madisons' request for attorneys' fees as a cost item pursuant to section 1033.5, subdivision (a)(10)(A). Attorneys' fees were the subject of a separate motion and appeal.

$2,400 in the field for "surety bond premiums" and "N/A" in the fields for "court-ordered transcripts" and "court reporter fees as established by statute." In the fields for "deposition costs" and "other," the Madisons wrote "attached." In an attachment, the Madisons provided a one-page summary of cost totals in 25 categories, followed by 40 pages of detail sheets listing the invoice date, amount, and a description of each claimed cost item.

A detail sheet with the heading "reporters, depositions, and transcript expenses" included 39 entries, some of which referred to a specific witness or deposition, but many of which referred only to the court reporter or videographer or contained a generic term like "hearing" or "deposition."[48] These items totaled $18,392. A separate detail sheet with the heading "Kamryn Whitney Services" included 47 dated entries for court reporter services, totaling $74,239. The great majority of these entries stated only an invoice number and Whitney's name, although a handful of entries identified the name of a trial witness, and a few entries referred to a "hearing" or "FSC" (final status conference).

A detail sheet titled "bond premium" included three $800 entries dated February 10, 2018, March 15, 2019, and February 20, 2020, each accompanied by the description "bond services for injunction."

A detail sheet titled "court appointed . . . expert fees" included 12 entries for "WS Enterprises" (Wax-Semus's company) totaling $32,647, with dates ranging from January 29, 2013 to June 12, 2014.

---

[48] Capitalization in the cost memorandum and detail sheets is omitted.

b.    *Theodore's motion to tax costs*

On February 10, 2021 Theodore timely filed a motion to tax costs, in which he sought to strike all but $19,338 of the claimed costs in the cost memorandum.  Theodore argued the costs generally were not reasonably necessary to the conduct of the litigation and were excessive.  (§ 1033.5, subd. (c)(2), (3).)  Theodore also challenged several individual categories of costs as unrecoverable under section 1033.5, subdivision (b).  Theodore argued the Madisons were not entitled to recover $84,971 in transcription-related costs "because there were no Court-ordered transcripts in this case in the first or the second trial."  Specifically, with respect to the Madisons' request for $74,239 in connection with Kamyrn Whitney Services, Theodore asserted, "[this] billing appears to be for transcripts from court proceedings, not ordered by the Court.  Therefore, the entirety of the $74,239[] . . . should be stricken."  As to the separate request for $18,392 for "reporters, depositions, and transcript expenses," Theodore argued the Madisons mingled recoverable deposition costs with nonrecoverable hearing- and trial-related costs.  He explained, "There are numerous entries in the Madisons' backup for transcripts for hearings, and based on the dates, for the first trial and second trial. . . .  The Madisons have not provided sufficient information in their memorandum to fully evaluate the costs sought under this category [and] have failed to establish that any transcript was ordered by the Court and their memorandum of costs summary admits to the same."  Theodore argued the trial court should award only those costs "where there are specific references to the deposition of an individual" in the item description.  Applying this criteria, only $7,660 for deposition costs should be allowed.

70

With respect to bond premiums, Theodore argued, "No injunction was ever granted in favor of the Madisons in this case where bond services would be required." Finally, Theodore moved to tax all of Wax-Semus's fees, arguing she was originally retained by the parties as a joint expert and "was not a Court-appointed expert." Moreover, "[a]ll of the fees generated by Wax-Semus were in connection with the trial that resulted in a mistrial" due to Kyle and Mink's ex parte communications with Wax-Semus. Theodore did not file any declarations or other evidence to support his motion to tax costs.

c.      *Opposition and reply*

In their opposition, the Madisons argued their entitlement to costs was not limited to statutory costs under section 1033.5, subdivision (a). They instead relied on the judgment, which stated (with italics added by the Madisons), "'During the trial, the parties stipulated that all costs and expenses (statutory, *nonstatutory, expert fees, liquidator fees*, and attorney fees) would be presented after trial.'" Thus, the Madisons argued, the stipulation contemplated that the costs award would include nonstatutory costs based on the fee provision in the operating agreement that allowed the prevailing party to recover "all reasonable fees, costs and expenses of enforcing any right of the prevailing party."[49]

---

[49]      In an effort to streamline the trial, the parties agreed to delay the presentation of cost evidence until after the judgment was entered. The Madisons' attorney (Mink) characterized the stipulation as follows: "Whoever wins, we can put on costs, whatever they may be. . . . [W]e each reserve the right to object

The Madisons argued the costs of all transcripts and reporter's fees, whether statutory or nonstatutory, were allowed pursuant to the judgment. The Madisons did not assert that the trial court ordered any transcripts, nor did they distinguish between deposition costs and the trial- and hearing-related costs.

With respect to bond premiums, the Madisons argued, "Theodore transferred substantially all his assets out of California except his Malibu house. Injunctive relief was needed because Theodore had acted in violation of the Madisons' rights which could render the judgment ineffectual." Thus, the bond premiums were a necessary cost of enforcing their rights under the judgment, and recovery was not limited by section 1033.5, subdivision (a).

Finally, with respect to Wax-Semus's fees, the Madisons submitted evidence that in January 2013 the trial court appointed Wax-Semus as a court expert under Evidence Code section 730. And in 2016 the court (Judge Jessner) found that Wax-Semus's work was highly competent and "'creditable,'" and Wax-Semus's compiled data formed the basis for Leh's damages analysis in both trials. Kyle attested in a supporting declaration that he paid Wax-Semus more than $133,846 over the years, but he only sought $32,647 in the cost memorandum because Kyle had been unable earlier to find the credit card receipts for the additional payments he made. Kyle subsequently obtained proof

_____

to them for whatever reasons. It would not be a proper objection to say, oh, no, you can't put on those costs because they're not normally within 1032 or 1033.5." Theodore's attorney agreed that Mink preserved his right to argue at a posttrial hearing that under the operating agreement, recoverable costs were "broader as opposed to just the Code of Civil Procedure costs."

of payment from Wax-Semus for the total amount he was billed, including numerous invoices and credit card payment slips he attached to his declaration. The Madisons requested the trial court amend their cost memorandum to include the additional $101,199 in payments to Wax-Semus.

In his reply, Theodore argued that pursuant to the stipulation, Theodore "specifically retained his right to require that any costs awarded be consistent with [section 1033.5]." Further, the judgment did not reflect a waiver of Theodore's right to challenge the Madisons' claimed costs. As to the bond premiums claimed by the Madisons, they were in connection with a bond posted to obtain a preliminary injunction in a separate action, *Kyle Madison et al. v. Michael Theodore et al.* (Super. Ct. L.A. County, 2017, No. BC652301) (the injunction action).[50] Theodore also filed hearsay and foundation objections to Kyle's declaration.

### d. *The order on costs*

On May 4, 2021 the trial court granted in part and denied in part the motion to tax costs. In its 10-page ruling, the court rejected the Madisons' argument that the parties stipulated and the judgment provided for the recovery of nonstatutory costs, explaining, "There is no showing before the court of a stipulation to recover all fees. The Judgment states that costs would be presented, not recovered; there is also no evidence in support of stipulation or waiver." On this basis, the court struck numerous categories of claims, including large payments to experts,

---

[50] On our own motion, we take judicial notice of the trial court docket in the injunction action. (Evid. Code, § 452, subd. (d).)

consultants, and the receiver, and for litigation support services. Overall, the court awarded only $160,562 of the $792,182 claimed in the cost memorandum.

The trial court allowed recovery of $92,631 in transcript costs. The court reasoned, "The burden is on [Theodore] to show impropriety. [Citation.] . . . [He] has not specifically indicated, which if any, deposition transcripts are not recoverable, or which, if any, court transcripts were not ordered by the court. [Theodore] does not meet this burden by representing that the majority of the transcripts are not recoverable . . . ."

The court found the bond premiums were facially allowable as "'[p]remiums on necessary surety bonds'" under section 1033.5, subdivision (a)(6). The court noted Theodore failed to present evidence showing the "injunction requiring bond services was not granted in this case," and instead, the premiums related to the separate injunction action.

Finally, with respect to Wax-Semus's fees, the trial court found Wax-Semus had been appointed as a court expert in January 2013, all of the claimed fees were reasonable and necessary to support the judgment, and in its statement of decision the court had already rejected the argument that "information from Ms. Wax-Semus's investigation should be distrusted." But the court sustained the objections to Kyle's declaration and limited the costs for Wax-Semus's fees to the $32,647 claimed in the Madisons' cost memorandum.

The May 4 order did not specify the amount of costs it awarded to the Madisons in light of the amounts that the court taxed.

74

2.      *Governing law and standard of review*

"'The right to recover any of the costs of a civil action "is determined entirely by statute."'" (*Berkeley Cement, Inc. v. Regents of University of California* (2019) 30 Cal.App.5th 1133, 1139; accord, *Rozanova v. Uribe* (2021) 68 Cal.App.5th 392, 399 (*Rozanova*) ["[t]he right to recover costs of suit is statutory"].) "Generally, the prevailing party is entitled as a matter of right to recover its costs. [§ 1032, subd. (b).] The costs that are allowable are listed in . . . section 1033.5, subdivision (a). Items that 'are not allowable as costs, except when expressly authorized by law' are listed in subdivision (b) of that section. Items that are not listed as allowable or not allowable 'may be allowed or denied in the court's discretion.' [§ 1033.5, subd. (c)(4).] All costs awarded must be 'reasonable in amount' and 'reasonably necessary to the conduct of the litigation rather than merely convenient or beneficial to its preparation.' [§ 1033.5, subd. (c)(2), (3)]." (*Berkeley Cement*, at p. 1139.)

"In ruling upon a motion to tax costs, the trial court's first determination is whether the statute expressly allows the particular item and whether it appears proper on its face. 'If so, the burden is on the objecting party to show [the costs] to be unnecessary or unreasonable.' [Citation.] Where costs are not expressly allowed by the statute, the burden is on the party claiming the costs to show that the charges were reasonable and necessary." (*Foothill-De Anza Community College Dist. v. Emerich* (2007) 158 Cal.App.4th 11, 29; accord, *Rozanova, supra*, 68 Cal.App.5th at p. 399.)

As this court explained in *Nelson v. Anderson* (1999) 72 Cal.App.4th 111, 131 (*Nelson*), "the mere filing of a motion to tax costs may be a 'proper objection' to an item [in a costs

75

memorandum], the necessity of which appears doubtful, or which does not appear to be proper on its face." (Accord, *Whatley-Miller v. Cooper* (2013) 212 Cal.App.4th 1103, 1115 (*Whatley-Miller*).) However, filing a motion to tax costs claimed in the costs memorandum that appear to be proper does not shift the burden to the party claiming the costs to prove they were reasonable and necessary. (*Nelson*, at p. 131; accord, *Rojas v. HSBC Card Services Inc.* (2023) 93 Cal.App.5th 860, 897, fn. 23 [agreeing that a "'mere filing' of a motion to tax costs may be proper objection for items of doubtful necessity, but disagreeing [that] 'mere objection to charges which . . . appear to be proper' shifts burden"].)

We generally review a costs award for an abuse of discretion. (*Rozanova, supra*, 68 Cal.App.5th at p. 399; *Berkeley Cement v. Regents of University of California, supra*, 30 Cal.App.5th at p. 1139.) "'Whether a cost item was reasonably necessary to the litigation presents a question of fact for the trial court and its decision is reviewed for abuse of discretion. [Citation.] However, because the right to costs is governed strictly by statute [citation] a court has no discretion to award costs not statutorily authorized.'" (*Rozanova*, at p. 399; accord, *Ladas v. California State Auto. Assn.* (1993) 19 Cal.App.4th 761, 774.) "'[W]hen the issue to be determined is whether the criteria for an award of costs have been satisfied, and that issue requires statutory construction, it presents a question of law requiring de novo review.'" (*Rozanova*, at p. 399; accord, *Berkeley Cement*, at p. 1139.)

3. *The trial court abused its discretion in awarding $84,971 for hearing and trial transcripts that were not ordered by the court*

Section 1033.5, subdivision (b)(5), disallows recovery of the costs of "[t]ranscripts of court proceedings, not ordered by the court." Theodore contends the Madisons improperly claimed $84,971 for transcripts that were not court-ordered. As discussed, the trial court rejected his argument on the basis that deposition costs are recoverable under section 1033.5, subdivision (a)(3)(A),[51] and Theodore failed to meet his burden to indicate "which, if any, court transcripts were not ordered by the court," and he did not present evidence "that the majority of the transcripts are not recoverable and should not be allowed." However, for most of the transcripts listed in the Madisons' cost memorandum, there is no facial indication they were allowable either as court-ordered transcripts or deposition transcripts, and the court therefore abused its discretion in shifting the burden to Theodore to prove each of these costs was disallowed.

On the verified cost memorandum, filed on Judicial Council Form MC-010, the Madisons wrote "N/A" on the line for "court-ordered transcripts." Moreover, there is no indication in the attachments (and the Madisons never argued) that the court ordered any transcripts or that any cost item or category of costs included court-ordered transcripts.

Our inquiry does not stop there because the Madisons also claimed deposition costs, which are recoverable by statute. (§ 1033.5, subd. (a)(3)(A).) However, the cost memorandum

_____

[51] Section 1033.5, subdivision (a)(3)(A), allows the recovery of the costs of "[t]aking, video recording, and transcribing necessary depositions."

77

summary did not list a total for the deposition costs, instead stating for the total, "[a]ttached." And the attached detail sheets included a mélange of entries, some of which appear facially to be recoverable (e.g., $940 for "Videographer for . . . M. Theodore's Depo. on 9/18/2012"); some that appear to be nonrecoverable (e.g., $455 for "transcript for 5/16 hearing"); and many more that cannot be categorized. The Madisons' method of presenting their costs placed the trial court in the untenable position of parsing which costs were authorized and which were not. But it was improper to place the burden on Theodore, who was not in a position to determine the meaning of the Madisons' entries, to prove they were unauthorized.

The Madisons failed to meet their burden to show the $74,239 they claimed on the detail sheet under the heading "Kamryn Whitney Services" were deposition costs. No entry refers to a deposition. To the contrary, the dates of the majority of the invoice entries were for a specific witness, a "hearing," an "FSC" (final status conference), or the 2018 trial. In his motion to tax costs, Theodore objected that the detail sheet "appears to be for transcripts from court proceedings, not ordered by the Court," and "the entirety of the $74,239[] . . . should be stricken." Although Theodore did not submit a declaration or any evidence, the mere filing of his motion to tax costs was a "'proper objection' to an item, the necessity of which appears doubtful, or which does not appear to be proper on its face." (*Nelson, supra*, 72 Cal.App.4th at p. 131; see *Whatley-Miller, supra*, 212 Cal.App.4th at p. 1115.) The trial court therefore abused its discretion in denying Theodore's request to strike the Kamryn Whitney Services costs in their entirety.

The 39 items totaling $18,392 the Madisons claimed under the heading "reporters, depositions, and transcript expenses" presented a thornier challenge. Some of these costs were evidently recoverable deposition costs, and it is true that Theodore "ha[d] not specifically indicated which, if any, deposition transcripts are not recoverable." But Theodore objected to only $10,732 of these costs (excluding the ones labelled as for a deposition), arguing "the only expenses under this category that should be allowed are where there are specific references to the deposition of an individual." We agree that any itemized claim that did not refer to a deposition was facially dubious, and Theodore's objection was sufficient to shift the burden back to the Madisons to identify the recoverable costs. The Madisons did not assert, let alone present evidence, that any of the entries to which Theodore objected pertained to a deposition. Accordingly, the trial court abused its discretion in denying Theodore's motion to strike $10,732 of these costs.

In their respondents' brief, the Madisons do not argue their cost memorandum included court-ordered transcripts, nor do they dispute Theodore's assertion that only $7,659 of the transcript costs related to depositions. Their only argument is that "the parties stipulated that the prevailing party could recover all nonstatutory costs." This argument fails.

First, the Madisons ignore that the trial court rejected this position. The same judge (Judge Alarcon) who presided over the trial at which the parties made their stipulation unequivocally found in the statement of decision that the parties had only agreed that they would present evidence of costs, whether statutory or nonstatutory, after the trial. Theodore did not forfeit

79

his right to challenge nonstatutory costs, and the Madisons point to nothing in the record indicating otherwise.

Moreover, although the Madisons reserved their right to seek nonstatutory costs after trial, the trial court did not award any. Indeed, the court's primary stated basis for striking nearly $632,000 in claimed costs was that the costs were not allowed under section 1033.5, subdivision (a), or were proscribed under subdivision (b). Although the court denied Theodore's request to strike transcript costs, it was because Theodore failed to show they were *not* court-ordered; there is nothing in the court's order to suggest the court would have allowed any transcript costs had it believed the costs were nonstatutory.

Further, the Madisons did not meet their burden to show they had a right to recover nonstatutory non-deposition costs based on the operating agreement. The operating agreement provides that the prevailing party may recover "all reasonable fees, costs and expenses of enforcing any right of the prevailing party." The Madisons have not presented authority that this language mandates the recovery of *any* litigation costs placed on a cost memorandum, especially given the limitation on recoverable costs under section 1033.5. They rely on *Arntz Contracting Co. v. St. Paul Fire & Marine Ins. Co.* (1996) 47 Cal.App.4th 464, 492 for the noncontroversial proposition that parties may contract for a cost recovery that is broader than what is authorized under section 1033.5, but the cost-provision in that case—a reciprocal cost recovery provision in an indemnification agreement between an insurer and a building contractor—was broader and "authorize[d] recovery of all 'costs, charges and expenses' and litigation expenses . . . pleaded and proven pursuant to a procedure stipulated by the parties," and the

80

reviewing court merely affirmed it was not an abuse of discretion for the trial court to allow an (unelaborated) broader cost recovery. (*Id.* at pp. 491-492.) Here, by contrast, the Madisons relied on the fact that Theodore waived any challenge to nonstatutory costs (he did not), and they did not present any authority or evidence that the operating agreement's fee-shifting provision was intended to expand the scope of recoverable costs under section 1033.5.

4. *The trial court abused its discretion in awarding $2,400 for bond premiums incurred in the injunction action*

Section 1032, subdivision (b), provides, "Except as expressly provided by statute, a prevailing party is entitled as a matter of right to recover costs in any action or proceeding." But "[c]osts are only allowable in the action in which the costs are incurred." (*Estate of Bauer* (1943) 59 Cal.App.2d 161, 163 [trial court properly disallowed deposition costs incurred in an earlier action despite parties' stipulation the depositions could be used in the subsequent action]; accord, *Carlson v. Lantz* (1929) 208 Cal. 134, 142 [cost of photographs incurred in an earlier action could not be sought in a subsequent action, even though the photographs were evidence for the same subject matter and cost recovery was not sought in the first action].) Theodore contends, as he argued below, that the three $800 bond premiums listed on the Madisons' cost memorandum were not incurred in this action, and the trial court erred in awarding them. Theodore is correct.

In denying Theodore's motion to tax the bond costs, the trial court found Theodore "ha[d] not carried the burden to support the argument with evidence and show that the bond

81

premiums are not recoverable as being sought in a different action."  In so ruling, the trial court misstated the parties' burdens.  In their cost memorandum, the Madisons described each of the three entries under the heading "bond premium" as "bond services *for injunction*."  (Italics added.)  The entries were dated February 10, 2018, March 15, 2019, and February 20, 2020. Even assuming this constituted a sufficient facial showing the premiums were allowable costs, Theodore's objection that "[n]o injunction was ever granted in favor of the Madisons in this case where bond services would be required" was a sufficient objection to shift the burden back to the Madisons to justify the claims. (*Whatley-Miller, supra*, 212 Cal.App.4th at p. 1115; *Nelson, supra*, 72 Cal.App.4th at p. 131.)  Theodore was not required to prove a negative by presenting additional evidence the costs were incurred in the injunction action.  Instead, he properly relied on the procedural history of the case and that the Madisons never requested an injunction.[52]  Although Theodore did not identify the case number of the injunction action until his reply memorandum, the same judge presided over both actions, the actions were related, and the court could have readily determined Theodore's objection was meritorious.

In their respondents' brief, the Madisons concede the bond premiums were incurred in the injunction action.  They argue that "[i]f the preliminary injunction had been rendered in *this* action, the Madisons as prevailing parties would have been

---

[52]    The trial court docket in this action identifies one motion for a preliminary injunction that was filed in May 2011, but the entry does not reflect the posting of a bond.  By contrast, the trial court docket in the injunction action indicates that a bond was posted in April 2017.

entitled to the cost of bond premiums," and "[i]t would subordinate substance to form to deny the premiums because they were incurred in [in the injunction] action—a related case filed to prevent the judgment in this action from becoming ineffectual . . . ." We disagree. The threshold question is not whether an injunction entered in another case was necessary to protect the judgment in this case, but whether the claimed "[p]remiums on necessary surety bonds" (§ 1033.5, subd. (a)(6)) were costs incurred in this action. (*Estate of Bauer, supra*, 59 Cal.App.2d at p. 163.) They were not. The Madisons could have filed a cost memorandum as the prevailing party in the injunction action; their failure to do so does not allow the recovery of the injunction action costs in this action. (*Carlson v. Lantz, supra*, 208 Cal. at p. 142.)[53]

>        5.       *The trial court did not abuse its discretion in*
>                 *awarding Wax-Semus's 2013 and 2014 fees*

Section 1033.5, subdivision (a)(8), provides for the recovery of "[f]ees of an expert witness ordered by the court." In 2013 the

---

[53]      The Madisons argue that *Estate of Bauer, supra*, 59 Cal.App.2d 161 and *Carlson v. Lantz, supra*, 208 Cal. 134 are inapposite because the earlier actions had been resolved when costs were sought in the subsequent actions, whereas in this case the injunction action was ongoing at the time of the order on costs. This is a distinction without a difference, and indeed, it underscores that the Madisons had a proper venue in which to recover their bond premiums. The Madisons also argue *Estate of Bauer* and *Lantz* are distinguishable because they involved statutory costs, not an agreement to recover all reasonable costs. But, as discussed, the trial court rejected (as do we) the argument that the Madisons proved their entitlement to nonstatutory costs.

trial court appointed Wax-Semus as a court expert, and she testified in the 2015 trial. In their cost memorandum, the Madisons sought Wax-Semus's fees incurred in 2013 and 2014. Their request was valid on its face, and we review the court's decision to award these fees for an abuse of discretion. (*Rozanova, supra*, 68 Cal.App.5th at p. 399.) The court found Theodore failed to demonstrate the fees were either unreasonable or unnecessary. There was no abuse of discretion.

On appeal, Theodore argues this case presents a legal "issue of first impression," positing the question: "What happens when a court initially appoints an expert to serve as a neutral referee but later disqualifies that expert after learning that she was, in fact, expert for one the parties?" But that hypothetical factual scenario is inconsistent with the factual and procedural history of this case.

Among the relevant facts are the following: In January 2013 the court appointed Wax-Semus not as a "neutral referee," but as a forensic accountant under Evidence Code section 730, to compile and analyze the Company's income and expenses. Wax-Semus presented her data and findings at the 2015 trial. In March 2016 the court appointed Wax-Semus as a referee under section 639, subdivision (a)(2), to conduct an accounting. In March 2017, the court granted Theodore's motion to disqualify Wax-Semus from serving as referee and from testifying as an expert at the second phase of the trial based on Wax-Semus's numerous ex parte communications with Kyle and Mink. As the trial court found, these communications exposed Wax-Semus "to a barrage of disparaging comments" about Theodore, leading to the "inescapable conclu[sion]" that she "*has become* Plaintiffs'

expert in this matter, rather than a neutral referee who abides by the standards imposed on judicial officers." (Italics added.)

Theodore sought to strike the 2013 and 2014 fees the Madisons paid to Wax-Semus when she was the court's forensic accountant. But in the same ruling granting Theodore's motion to disqualify Wax-Semus, the trial court denied Theodore's concurrent request to vacate the 2015 statement of decision. The court found Wax-Semus's analysis and testimony were of a "high quality" (a formidable achievement in light of Theodore's discovery misconduct). The court further found Theodore had a full opportunity at the 2015 trial to interrogate Wax-Semus about her ex parte communications with the Madisons up to that point, and in those emails, "there [was] no evidence that Wax-Semus entertained the same bias [i.e., against Theodore]."

In the 2018 statement of decision, the trial court likewise found that Wax-Semus was a credible witness, her data was reliable, and Leh's analysis derived from that data was credible and persuasive. The court explained, "Theodore's argument that the information should be distrusted because Pamela Wax-Semus secured it, is wholly rejected. First, the court, after listening to the entirety of the testimony of Pamela Wax-Semus, found no evidence that she harbored a bias that compromised the integrity of her work. Based on the limited records and documents Wax-Semus was provided with, which became the primary evidence, the court sees no evidence that Ms. Wax-Semus' work was biased."

Thus, notwithstanding the trial court's statement in 2017 that Wax-Semus "has become Plaintiffs' expert in this matter" during her service as a section 638 referee, the court on several occasions expressly found that Wax-Semus was unbiased,

85

credible, and competent in her earlier work as the court's forensic accounting expert under section 730. It was in connection with this earlier appointment only that the Madisons sought and recovered costs. Substantial evidence does not support Theodore's proffered scenario in which the Madisons sought to recover the fees of a nominally neutral but effectively partisan expert under section 1033.5, subdivision (a)(8).[54] We therefore affirm the award of $32,647 for Wax-Semus's witness fees incurred in 2013 and 2014.

---

[54] In his reply, Theodore argues that *In re Marriage of Laurenti* (2007) 154 Cal.App.4th 395 is analogous and supports reversal. In *Laurenti,* we reversed a family court order requiring a wife to pay the full invoice of an Evidence Code section 730 child custody evaluator who was removed prior to completing his evaluation because of improper ex parte communications with the wife (contacting her directly to complain about her failure to schedule an appointment). (*Id.* at pp. 402-403.) We remanded for the family court to hold a new hearing "to determine a reasonable amount of compensation" the wife should pay in light of the evaluator's disqualification and the value of the expert's billed services, which the family court was required to assess but failed to do under California Rules of Court, rule 5.2220. (*Id.* at pp. 403, 405.) Here, by contrast, Wax-Semus was disqualified from a later appointment and the Madisons recovered costs for Wax-Semus's earlier, unblemished services. We reversed the family court order in *Laurenti* because the court failed to consider the reasonableness of the evaluator's fees. Here, the trial court made findings regarding the reasonableness and necessity of Wax-Semus's fees.

D.    *Theodore's Appeal from the Order Awarding Attorneys' Fees (Case No. B314812)*

Theodore appeals from the trial court's June 28, 2021 order awarding the Madisons $1,751,500 in attorneys' fees as the prevailing party.  Theodore contends the court abused its discretion in awarding nearly $110,000 to the Madisons for Mink's work in opposing Theodore's successful efforts to obtain a mistrial based on Mink's improper ex parte communications with Wax-Semus.  Theodore also contends the court erred in rejecting his request to offset the award with nearly $1 million in attorneys' fees and expert costs that Theodore incurred in connection with the motion for a mistrial.[55]  The court did not abuse its discretion in awarding the Madisons their attorneys' fees incurred in opposing Theodore's motion for a mistrial, which reflected a reduction of $340,850 for Mink's misconduct.  Further, Theodore has not provided any legal basis for his contention he had a right to recover nearly $1 million in his own attorneys' fees and costs as an offset against the attorneys' fees awarded to the Madisons.

1.    *Procedural background*

On February 5, 2021 the Madisons filed a motion for attorneys' fees pursuant to Civil Code section 1717 and the fees provision of the operating agreement.  The Madisons requested $2,124,450, which they calculated by multiplying Mink's hourly rate of $500 by 4,249 hours that Mink billed them between

---

[55]    Theodore further contends the order for attorneys' fees should be reversed because the underlying judgment must be reversed.  Because we affirm the judgment, we do not reverse the fees order.

87

October 31, 2011 and January 29, 2021.[56] The fees motion and Mink's supporting declaration described conduct by Theodore and his attorney (Spielfogel) that complicated the litigation and required Mink to devote thousands of hours to the case (for example, Theodore's failure to respond to discovery requests, requiring Mink to file 10 motions to compel discovery). Mink's declaration attached copies of his law firm's electronic time records comprising daily entries in chronological order with summaries of the tasks performed (e.g., two hours on October 13, 2021 to "[r]eview Theodore discovery responses to prepare for meet and confer"), the hours (and increments of hours) spent, and the total amount billed on a given day. However, the fees motion did not apportion fees incurred in connection with specific phases of the litigation. The Madisons did not write off or reduce any of Mink's claimed time.

In his opposition, Theodore argued the trial court should disallow or dramatically reduce the Madisons' attorneys' fees to address Mink's abusive litigation tactics and misconduct that caused the 2017 mistrial. At a minimum, according to Theodore's one-page declaration, any award should account for approximately $1 million that Theodore "lost" as a result of Mink's (and Kyle's) improper ex parte emails with Wax-Semus and Diamond, including about $210,000 in attorneys' fees incurred "between the date Wax-Semus came on board and the

---

[56] The Madisons also sought $4,000 for their attorneys' time in preparing the fee application, plus a $62 filing fee; these amounts are not at issue on appeal.

date Judge Jessner issued her Statement of Decision."[57] Theodore also asked the court to disallow any fees for "the period of the engagement of Wax-Semus and the commencement of the trial before Judge Alarcon, because to do so would reward Mink and the Madisons for their misconduct." (Boldface omitted.) According to Theodore, although Mink's billing methods made it difficult to determine how much time Mink devoted to a particular task, Mink billed the Madisons in excess of $1 million during this time period.

Theodore asserted the trial court should disallow approximately $161,000 billed by Mink to prepare for the 2015 trial; $115,000 billed during the 2015 trial; $40,000 in posttrial litigation relating to the 2015 statement of decision; $9,500 "to oppose the motion for mistrial since [Mink] was the cause of the mistrial" (boldface omitted); and $9,000 to oppose a motion for terminating and other sanctions (sanctions motion) that Theodore filed on April 28, 2017.[58]

---

[57] As set forth in Theodore's opposition and supporting declaration, Theodore's claimed losses also included $300,000 of Spielfogel's fees incurred after the 2015 statement of decision issued. It is not clear whether this sum included Spielfogel's fees for the 2018 trial or was limited to the period before the mistrial. Theodore's claimed losses also included approximately $125,000 in expert fees paid to Wax-Semus, more than $200,000 paid to Diamond, $109,000 paid to Theodore's retained experts, and $53,000 paid to an accountant Theodore hired to help respond to Wax-Semus's demands.

[58] As discussed, after the case was reassigned to Judge Alarcon, on April 18, 2017 Theodore filed a motion for mistrial and to strike the 2015 statement of decision (mistrial motion). On April 28, 2017 Theodore filed the sanctions motion,

Theodore filed in support of his opposition a 123-page declaration from Spielfogel and a 543-page compendium of exhibits that Theodore previously filed in support of his April 2017 sanctions motion, in which he compiled hundreds of Mink's and Kyle's ex parte emails with Wax-Semus and Diamond and highlighted the most incendiary exchanges.

In their reply, the Madisons argued the trial court should award all their fees incurred in connection with the 2015 trial notwithstanding Judge Jessner's recusal and the subsequent mistrial because the court found there was no evidence Wax-Semus was biased or that the evidence at trial was tainted. Similarly, the Madisons were entitled to fees incurred between the October 2015 statement of decision and Wax-Semus's disqualification in March 2017 because the disqualification was limited to Wax-Semus's ongoing role as referee, not her previous work.

On the same day the Madisons filed their reply, Theodore filed a supplemental opposition addressing a new Court of Appeal decision on attorneys' fees, *Karton v. Ari Design & Construction, Inc.* (2021) 61 Cal.App.5th 734 (*Karton*). In *Karton*, the appellate court held a trial court may consider, in deciding a motion for attorneys' fees, whether the incivility of the prevailing party's

_____

which he titled a "motion for various orders," including "(1) an order terminating the complaint of plaintiffs; (2) an order striking the answer of cross-defendants; and, (3) an order requiring reimbursement by plaintiffs and their attorney, Lyle Mink, in the amount of $1,321,348.55." Although the sanctions motion is not in the record on appeal, it appears from the trial court docket that the hearing on the motion was continued several times. According to Theodore's counsel at oral argument, the trial court did not grant the relief requested in the sanctions motion.

attorney increased the litigation costs, and on that basis reduce the fee award.[59]  (*Id.* at p. 747.)  The *Karton* court reasoned that a lawyer's skill is a long-accepted consideration in adjusting an attorneys' fees lodestar, and "[c]ivility is an aspect of skill." (*Ibid.*)  The court explained, "Incivility can rankle relations and thereby increase the friction, extent, and cost of litigation. Calling opposing counsel a liar, for instance, can invite destructive reciprocity and generate needless controversies." (*Ibid.*)  Theodore argued that Mink in his communications with Wax-Semus relentlessly criticized Theodore and Spielfogel, going so far as to accuse them of crimes, and this amounted to "gross incivility."

The trial court ordered the parties to file supplemental briefing on *Karton* addressing whether the court should reduce the attorneys' fees award based on Mink's incivility "in calculation of the lodestar figure for reasonable hours worked," and if so, to provide a "calculation of the hours to be reduced" due to Mink's misconduct.[60]  The court stated it was "tentatively

---

[59]     *Karton, supra*, 61 Cal.App.5th at page 740, involved a motion for attorneys' fees under section 1029.8, subdivision (a), which provides that a defendant who is unlicensed in violation of certain business licensing requirements may be liable for treble damages for injuries caused to the plaintiff, and "[t]he court may, in its discretion, award all costs and attorney's fees to the injured person if that person prevails in the action."

[60]     We augment the appellate record on our own motion to include the trial court's May 10, 2021 minute order requesting additional briefing.  (Cal. Rules of Court, rule 8.155(a)(1)(A).) The court's order also requested the parties brief whether an adjustment to the lodestar calculation should be made instead of

---

inclined to find that at least a portion of the previous trial was not exempt from attorney's fee recovery, because the case was terminated based on recusal of the court, not specifically because of ex parte communications."

In supplemental briefing, Theodore reiterated his request that the trial court disallow fees for Mink's 2015 trial preparation, trial, posttrial litigation, opposition to the motion for mistrial, and opposition to the sanctions motion (totaling $334,500). Theodore also requested the court disallow "fees for all of the time asserted by [M]ink that in any way related to the aborted phase one trial, including pre-trial preparation and post-trial motions and related activities, which approximates $450,750." Theodore did not explain how he calculated this figure or attach any supporting or explanatory documentation. Theodore again requested the court offset any award by approximately $1 million in attorneys' fees and other costs Theodore incurred as a result of Mink's misconduct.

The Madisons argued in their supplemental brief that incivility by Mink should not be "a factor in the fees being sought" given that the trial court in its 2015 statement of decision commended Mink and Spielfogel for their civility during the trial. To the extent the court was inclined to reduce Mink's hours or adjust the lodestar based on Mink's emails with Wax-Semus and Diamond, the reduction should be limited to the time Mink spent drafting the emails, not all litigation related to the disqualification.

---

reducing the number of hours (for example, by applying a fractional multiplier) to account for an attorney's incivility.

On June 28, 2021 the trial court granted the Madisons' fees motion in part, awarding a reduced sum of $1,751,500. In its 15-page ruling, the court found the Madisons were entitled to prevailing party attorneys' fees under the operating agreement and that Mink's $500 hourly rate was reasonable. The court addressed at length *Karton, supra*, 61 Cal.App.5th 734 and whether and to what extent the Madisons' fees should be reduced due to Mink's misconduct. The court concluded, "[A] reduction of fees related to phase one of trial of $340,850 (constituting billing for pre-trial preparation, trial, and posttrial documents related to phase one of trial) leads to a reasonable calculation of attorneys' fees."[61] (Boldface and underline omitted.) Such a reduction "aligns with the permissible adjustment of the lodestar amount in this action, for the unnecessary incivility and excess litigation . . . ."[62]

However, the court rejected Theodore's argument that the court should disallow "fees related to opposing the motions for

_____

[61] It is unclear how the trial court calculated $340,850 for the Madisons' fees incurred in connection with the 2015 trial. As discussed, Theodore' itemized requests sought a reduction in fees of approximately $161,000 for pretrial, $115,000 for trial, and $40,000 for posttrial, totaling $316,000 (excluding the hours spent on the mistrial and sanctions motions). The court noted it had reviewed "the amounts that [Theodore] asserts are unreasonable to award" and found "the requests are less than full amounts accrued during the time frames discussed," but the court did not elaborate further.

[62] The court also disallowed 4.5 hours of Mink's work in corresponding with Diamond, resulting in a fee reduction of $2,250, as well as $29,850 billed in the injunction action. These reductions are not at issue in this appeal.

93

mistrial or terminating sanctions as unreasonable." The Madisons "were entitled to make such arguments, just as [Theodore] was entitled to move for mistrial." The court also rejected Theodore's argument that the Madisons' fees should be reduced to reflect the money Theodore "lost . . . in payments to numerous persons," finding Theodore had presented "[n]o competent evidence . . . in support of this contention" or argument showing how this related to the reasonableness of the Madisons' attorneys' fees.

2. *Governing law and standard of review*

"In any action on a contract, where the contract specifically provides that attorney's fees and costs, which are incurred to enforce that contract, shall be awarded either to one of the parties or to the prevailing party, then the party who is determined to be the party prevailing on the contract . . . shall be entitled to reasonable attorney's fees in addition to other costs." (Civ. Code, § 1717, subd. (a).)[63] "'[T]he ability of lawyers to perform their important professional function in society is in the long run dependent on assurances they will be fairly compensated for their work. [Citation.] As a result, California law requires that attorneys' fees awards be 'fully compensatory.'" (*Roth v. Plikaytis* (2017) 15 Cal.App.5th 283, 290; accord,

---

[63] "If a contractual attorney fee provision is phrased broadly enough . . . it may support an award of attorney fees to the prevailing party in an action alleging both contract and tort claims." (*Santisas v. Goodin* (1998) 17 Cal.4th 599, 608.) Theodore does not challenge the trial court's finding that as the prevailing party the Madisons are entitled under the operating agreement to all fees reasonably incurred in the action.

94

*Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1133 (*Ketchum*) [fee awards "should be fully compensatory" and "'ordinarily include compensation for *all* the hours *reasonably spent*'"].)

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate." (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1095; accord, *Ketchum, supra*, 24 Cal.4th at p. 1134; *Roth v. Plikaytis, supra*, 15 Cal.App.5th at p. 290.) "The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided. [Citation.] Such an approach anchors the trial court's analysis to an objective determination of the value of the attorney's services, ensuring that the amount awarded is not arbitrary." (*PLCM Group*, at p. 1095; accord, *State Farm General Ins. Co. v. Lara* (2021) 71 Cal.App.5th 197, 210.)

Among the factors a court may consider in adjusting the lodestar are the following: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, [and] (4) the contingent nature of the fee award." (*Ketchum, supra*, 24 Cal.4th at p. 1132; accord, *Laffitte v. Robert Half Internat., Inc.* (2016) 1 Cal.5th 480, 489 ["'Once the court has fixed the lodestar, it may increase or decrease that amount by applying a positive or negative "multiplier" to take into account a variety of other factors, including the quality of the representation, the novelty and complexity of the issues, the results obtained, and the contingent risk presented.'"]; *Karton, supra*, 61 Cal.App.5th at p. 744 ["Germane factors include the nature, difficulty, and extent of the

litigation, the skill it required, the attention given, and the success or failure of the enterprise, as well as other factors."].)

We review the propriety and amount of an attorneys' fees award for an abuse of discretion. (*Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751 (*Mountain Air*); see *PLCM Group, Inc. v. Drexler, supra*, 22 Cal.4th at p. 1095 ["the trial court has broad authority to determine the amount of a reasonable fee"].)[64] In particular, the "trial court has broad discretion to increase or reduce the proposed lodestar amount based on the various factors identified in case law." (*Hanna v. Mercedes-Benz USA, LLC* (2019) 36 Cal.App.5th 493, 510; accord, *Ketchum, supra*, 24 Cal.4th at p. 1138 [trial court "has broad discretion to adjust" the lodestar amount]; see *Taylor v. Nabors Drilling USA, LP* (2014) 222 Cal.App.4th 1228, 1249 ["'In reviewing a challenged award of attorney fees and costs, we presume that the trial court considered all appropriate factors in selecting a multiplier and applying it to the lodestar figure.'"].) As the Supreme Court has explained, "'The "experienced trial judge is the best judge of the value of professional services rendered in his court, and while [the trial court's] judgment is of course subject to review, it will not be disturbed unless the appellate court is convinced that it is clearly wrong."'" (*PLCM Group*, at p. 1095.)

In the trial court, the "'"burden is on the party seeking attorney fees to prove that the fees it seeks are reasonable."'" (*Vines v. O'Reilly Auto Enterprises, LLC* (2022) 74 Cal.App.5th 174, 184; accord, *Baxter v. Bock* (2016) 247 Cal.App.4th 775, 793

---

[64] By contrast, we review the legal basis for an attorney fee award de novo. (*Mountain Air, supra*, 3 Cal.5th at p. 751; *Reyes v. Beneficial State Bank* (2022) 76 Cal.App.5th 596, 604.)

[moving party bears the "burden to persuade the trial court the work was reasonably necessary, both as to the particular tasks performed and the amount of time devoted to them"].)  On appeal, however, it is the appellant's burden ""'to prove the trial court abused its discretion in awarding fees.'"'"  (*Gonzalez v. Santa Clara County Dept. of Social Services* (2017) 9 Cal.App.5th 162, 169; accord, *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 615.)

3. *The trial court did not abuse its discretion in allowing the Madisons to recover fees for opposing Theodore's mistrial motion after reducing their fees by $340,850*

Theodore contends the trial court "got it *almost* right" in reducing the Madisons' attorneys' fees by $340,850 to account for Mink's misconduct, but the court abused its discretion in allowing the Madisons to recover fees "they incurred in unsuccessfully opposing a mistrial."  According to Theodore, $110,000 of the trial court's award of attorneys' fees to the Madisons was spent in opposing Theodore's mistrial motion, and therefore, the trial court abused its discretion in failing to reduce the award by this additional amount.  Theodore argues the court "recognized that the Madisons could not be rewarded for their misconduct" yet allowed them "to recover the fees that they incurred in trying to avoid the consequences of their misconduct."  There was no abuse of discretion.

As a threshold matter, Theodore does not explain how he calculated the $110,000 in attorneys' fees that he claims the trial court improperly awarded to the Madisons for opposing Theodore's mistrial motion.  In his supplemental brief on *Karton*, Theodore asserted without any evidence or elaboration that the

court should reduce the Madisons' fees by $450,750, which reflected "all of the time asserted by [M]ink that in any way related to the aborted phase one trial, including pre-trial preparation and post-trial motions and related activities." In his opening brief, he asserts $450,750 "was attributable to the attorney's fees that the Madisons incurred in connection with the mistrial." Given Theodore's request that we direct the trial court to reduce the fees award by about $110,000, we assume this number reflects the difference between the $450,750 (his requested reduction) and the $340,850 reduction in fees ordered by the trial court. However, even if the $450,750 had an evidentiary foundation (it does not), it does not follow that $110,000 represents the Madisons' fees "in unsuccessfully opposing a mistrial." Numerous other issues were being litigated between 2015 and 2017. Moreover, in opposition to the fees motion, Theodore asked the court to "decline to award Mink $9,500 to oppose the motion for mistrial." (Capitalization omitted.) Theodore's attorney at oral argument asserted the $110,000 included attorneys' fees spent in connection with the mistrial motion that went beyond preparation of the Madisons' opposition brief, but counsel did not specify the amount of fees incurred for specific tasks that totaled $110,000.

Regardless of how Theodore calculated the $110,000 in claimed excessive fees, more fundamentally Theodore mischaracterizes the trial court's order as reducing the fees award to avoid rewarding the Madisons for Mink's misconduct. To the contrary, the trial court in its order painstakingly considered the parties' arguments and fee calculations, weighed the lodestar adjustment factors articulated in *Ketchum, supra*, 24 Cal.4th at page 1132 and other cases, and found that Mink's

ex parte emails with Wax-Semus caused an "unnecessary expansion of the litigation." As discussed, the court concluded that a $340,850 reduction in fees was reasonable and "align[ed] with the permissible adjustment of the lodestar amount in this action, for the unnecessary incivility and excess litigation."

Theodore only argues on appeal that the trial court did not have discretion to award fees for the Madisons' unsuccessful opposition to the mistrial motion. He does not argue the court incorrectly applied the lodestar factors or that any of the fees (other than for the mistrial motion) were unreasonable. Nor does he point to anything in the record that supports a greater reduction. And Theodore does not cite any authority, nor are we aware of any, for the proposition that a trial court must exclude fees incurred in connection with an unsuccessful opposition to a motion.[65] To the contrary, as discussed, prevailing party fee awards under Civil Code section 1717 ordinarily should include

---

[65] Theodore cites several cases for the generic proposition that "neither the parties nor their attorneys are allowed to profit from their misconduct," but none of the cases addresses an attorneys' fee award. In *American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1481, the court held that unjust enrichment and disgorgement are remedies available on a claim for aiding and abetting breach of fiduciary duty. In *Fair v. Bakhtiari* (2011) 195 Cal.App.4th 1135, 1161, the court held an attorney cannot bring a quantum meruit claim against a client where the attorney has committed a rules violation that is also a "serious breach of fiduciary duty." In *People v. Elliott* (2012) 53 Cal.4th 535, 583, the Supreme Court affirmed that "[b]ecause a [criminal] defendant is not allowed to profit from his own misconduct, a defendant 'may not complain on appeal about the possible effect on jurors of his own misbehavior after the jury has been sworn.'"

compensation for all hours reasonably spent.  (*Ketchum, supra*, 24 Cal.4th at p. 1133.)  Although trial courts have discretion to reduce the lodestar to account for the "nature, difficulty, and extent of the litigation, the skill it required, the attention given, and the success or failure of the enterprise," (*Karton, supra*, 61 Cal.App.5th at p. 744), the case law focuses on the success of the litigation, not specific motions.

In addition, Theodore's argument incorrectly assumes the mistrial was "caused by" Mink's misconduct.  Although the trial court (Judge Jessner) found that Mink and Kyle's conduct was "deeply troubling" and they were "chiefly to blame" for Wax-Semus's disqualification as referee, the court found the 2015 trial was not tainted by misconduct, and it denied Theodore's requests to vacate the statement of decision and for sanctions.  It was Judge Jessner's decision to recuse herself, not any defect in the 2015 trial, that precipitated the mistrial, and the mistrial was only ordered after we held in *Theodore v. Superior Court, supra,* B282670 that Theodore was entitled to have the same judge try all portions of a bifurcated bench trial."'

Even if we assume that Mink's misconduct caused re-litigation of issues tried in 2015, justifying the trial court's disallowance of the fees Mink billed for that trial, it does not follow that the Madisons' decision to oppose the mistrial motion was unreasonable or that the fees incurred in so doing were "nullified" by the order declaring a mistrial.  The mistrial motion was based not only on Judge Jessner's recusal, but also on the argument that the 2015 trial was tainted by Wax-Semus's bias against Theodore; thus, Theodore argued, "any order based on data or opinions provided to the Court by Ms. Wax-Semus is necessarily tainted."  (Boldface omitted.)  Had the Madisons

100

failed to oppose the mistrial motion, the trial court (Judge Alarcon) might well have discarded all of Wax-Semus's work product, even though the work was repeatedly found to be competent, credible and unbiased, and was used in the 2018 trial. As the trial court found in allowing fees for the Madisons' oppositions to the mistrial and sanctions motions, the Madisons "were entitled to make such arguments, just as [Theodore] was entitled to move for mistrial." Theodore has not met his burden to demonstrate how the court's finding was an abuse of discretion. (*Gonzalez v. Santa Clara County Dept. of Social Services, supra*, 9 Cal.App.5th at p. 169.)

> 4. *The trial court did not err in denying Theodore's request for an offset for his fees and costs*

Theodore contends the trial court erred in finding it did not have authority to offset the Madisons' fee award with the attorneys' fees and expert costs Theodore incurred as a result of the mistrial. Theodore's contention lacks merit. As the court found, Theodore "provide[d] no legal authority" for an offset, and he failed to offer any "competent evidence" to support his offset claim. We are not aware of any authority that allows a non-prevailing party to recover attorneys' fees and costs as an offset to the prevailing party's fee award. Indeed, the law is clear to the contrary.

"Except as attorney's fees are specifically provided for by statute, the measure and mode of compensation of attorneys . . . is left to the agreement, express or implied, of the parties." (§ 1021; accord, *Mountain Air, supra*, 3 Cal.5th at p. 751 ["Under the American rule, each party to a lawsuit ordinarily pays its own attorney fees," but "section 1021 permits parties to '"contract

101

out" of the American rule' by executing an agreement that allocates attorney fees."].)  Civil Code section 1717, subdivision (a), provides that where a contract provides for fee shifting, the party "determined to be the prevailing party on the contract" shall receive their fees.  "[W]ithin a given lawsuit, there can be only one prevailing party entitled to attorney fees as 'the party prevailing on the contract.'" (*Frog Creek Partners, LLC v. Vance Brown, Inc.* (2012) 206 Cal.App.4th 515, 539; accord, *Burkhalter Kessler Clement & George LLP v. Hamilton* (2018) 19 Cal.App.5th 38, 44.)  Code of Civil Procedure section 1032, subdivision (b), similarly provides the "prevailing party is entitled as a matter of right to recover costs in any action or proceeding."  The prevailing party is typically the party with a net monetary recovery in the action.  (Civ. Code, § 1717, subds. (b), (c); Code Civ. Proc., § 1032, subd. (a)(4).)  Theodore was not the prevailing party, so he is not entitled to recover his fees under Civil Code section 1717 and the operating agreement (or his costs under Code of Civil Procedure section 1032).

Theodore relies on *Sherman v. Kinetic Concepts Inc.* (1998) 67 Cal.App.4th 1152, 1163 for his contention that "a party who suffers a mistrial as a result of the opposing party's misconduct is entitled to recover the fees and costs incurred in the mistrial." But *Sherman* did not involve a mistrial, prevailing party attorneys' fees, or an offset against a prevailing party fees award. Rather, the Court of Appeal held the trial court erred in denying the plaintiffs' motion for new trial, and further, the trial court should have granted the plaintiffs' request for sanctions under section 128.5 "in an amount *at least* sufficient to compensate the Shermans for the costs, including attorney fees, of the first trial." (*Sherman*, at p. 1164; see § 128.5 ["Every trial court may order a

party, the party's attorney, or both, to pay any reasonable expenses, including attorney's fees, incurred by another party as a result of bad-faith actions or tactics that are frivolous or solely intended to cause unnecessary delay."].)  In contrast to *Sherman*, the June 28, 2021 attorneys' fees order was not based on section 128.5 or any other sanctions statute.  Theodore was entitled to file (and he repeatedly did file) motions for sanctions based on Mink's emails, but he did not prevail on any of them.  And the statutory bases and procedures governing sanctions have nothing to do with a prevailing party's entitlement to attorneys' fees under Civil Code section 1717.

Theodore's reliance on *Hunt v. Fahnestock* (1990) 220 Cal.App.3d 628, 633 fares no better.  *Hunt* involved an action by a junior lienholder (Hunt) for foreclosure on two properties and a cross-complaint by the senior lienholder (Community) on one of the properties for indemnity against the debtors (the Fahnestocks).  (*Id.* at pp. 630-631.)  The trial court ruled for Hunt as to one property, for the Fahnestocks on the second property, and for Community on the cross-complaint, and awarded attorneys' fees to each of the three parties as prevailing parties.  (*Id.* at p. 631.)  On appeal, Hunt challenged the trial court's award of attorneys' fees to the Fahnestocks and Community on the basis the trial court impermissibly created three prevailing parties in one action in violation of Civil Code section 1717.  (*Hunt*, at p. 632.)  The Court of Appeal affirmed, explaining "the action and cross-action involved three independent, unrelated contracts, and a different party prevailed upon each."  (*Ibid.*)  Unlike *Hunt*, this case involves a single contract and lawsuit

103

between two parties, for which there can be only one prevailing party under Civil Code section 1717.[66]

---

[66] Theodore also relies on the language in *Hunt* applying "equitable principles" to support an offset of the attorneys' fees awarded to Community against the unpaid balance due on the foreclosed property. (See *Hunt v. Fahnestock, supra*, 220 Cal.App.3d at p. 633.) The offset in *Hunt* was against a debt, not a prevailing party's attorneys' fees, and it did not involve misconduct by the prevailing party. The other cases cited by Theodore addressing an "equitable offset" are even further afield, and none involved an offset against an award of attorneys' fees. (See *McMillin Companies, LLC v. American Safety Indemnity Co.* (2015) 233 Cal.App.4th 518, 534-536 [addressing offset to contract damages for settlement proceeds]; *Newhall Land and Farming Co. v. McCarthy Constr.* (2001) 88 Cal.App.4th 769, 774 [discussing circumstances under which a claim for an equitable offset may be alleged as affirmative defense]; *Salaman v. Bolt* (1977) 74 Cal.App.3d 907, 915 [allowing offset to judgment (that included attorneys' fees) against judgment in unrelated action].) And the reference to "equitable principles" in *Lewis v. Alpha Beta Co.* (1983) 141 Cal.App.3d 29, 34 was in the context of a determination of the prevailing party where nonmonetary remedies were involved.

# DISPOSITION

The judgment is modified to reduce the damages award from $3,928,300 to $3,907,562.  As modified, the judgment is affirmed.

We reverse the May 4, 2021 order on Theodore's motion to tax costs with respect to the trial court's denial of Theodore's motion to tax $84,971 in hearing and trial transcript costs and $2,400 in surety bond premiums.  We otherwise affirm the court's order.  We remand for the limited purpose of the court calculating the amount of costs awarded to the Madisons consistent with this opinion.

The June 28, 2021 order for attorneys' fees is affirmed.

The Madisons are to recover their costs on appeal in case numbers B310551 (judgment) and B314812 (attorneys' fees).  The parties are to bear their own costs in case number B313727 (costs).


                                        FEUER, J.

We concur:


        MARTINEZ, P. J.


        STONE, J.